1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AT&T CORP and                          )    No. 04-CV-_____
ALASCOM, INC. d/b/a                    )
AT&T Alascom,                          )    **COMPLAINT**
                                       )
            Plaintiffs,                )
                                       )
      v.                               )
                                       )
DAVID W. WALKER,                       )
DONALD J. SCHROEDER and                )
TERRY A. GUNSEL,                       )
                                       )
            Defendants.                )
                                       )

18
19
20

Plaintiffs AT&T Corp and Alascom, Inc. (collectively, "AT&T"), by their undersigned attorneys, complaining of defendants Donald J. Schroeder, David W. Walker and Terry A. Gunsel (collectively, the "Defendants"), allege as follows:

21

<u>Nature of the Action</u>

22
23
24
25

1.    As alleged herein, since 1998 Defendants have been engaged in a scheme to defraud AT&T and numerous other international telecommunications carriers out of tens of millions of dollars by causing PT Cable, Inc. ("PTC"), a corporation which Defendants own,

26

COMPLAINT                          - 1 -
Case No. 04-CV-_____
30808672.2

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

1    direct and control, to grossly inflate the invoices it rendered for the costs of operating and
2    maintaining an undersea telecommunications cable.    The Defendants' object has been to
3    personally enrich themselves unfairly at the expense of AT&T and these other
4    telecommunications carriers. AT&T seeks damages from the Defendants for: (1) common law
5    fraud; (2) aiding and abetting breaches of fiduciary duty; (3) breaches of fiduciary duty to
6    creditors; (4) wrongdoing through their corporation; (5) constructively fraudulent conveyances;
7    (6) actually fraudulent conveyances; (7) violations of the Racketeer Influenced and Corrupt
8    Organizations Act, 18 U.S.C. §1961, *et seq*.; and (8) authorizing dividends in violation of the
9    Delaware Corporation Law.

### Parties, Jurisdiction and Venue

10    2.      Plaintiff AT&T Corp is a corporation organized and existing under the laws of the
12    State of New York, with its principal place of business at One AT&T Way, Bedminster, NJ
14    07921-0752.

16    3.      Plaintiff Alascom, Inc., doing business as AT&T Alascom, is a wholly owned
17    subsidiary of AT&T Corp., organized and existing under the laws of the State of Alaska, with its
18    principal place of business at 505 East Bluff Road, Anchorage, AK, 99501-1100.

20    4.      Defendant David W. Walker ("Walker") is an individual residing, upon
21    information and belief, at 1409 Northwest 86th Street, Vancouver, Washington, 98665.  Walker
22    is, upon information and belief, a Director, the President and Chief Executive Officer of PTC and
23    the owner of 25% of its issued and outstanding stock.

COMPLAINT                          - 2 -
Case No. 04-CV-_____

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

5.      Defendant Donald J. Schroeder ("Schroeder") is an individual residing, upon information and belief, at 27 Ocean Club Drive, Fernandina Beach, Florida, 32034. Schroeder is, upon information and belief, a Director and the Chairman of PTC and the owner of 50% of its issued and outstanding stock.

6.      Defendant Terry A. Gunsel ("Gunsel") is an individual residing, upon information and belief, at 8 Bryce Lane, Newton, Pennsylvania, 18940. Gunsel is, upon information and belief, a Director, the Treasurer and Chief Financial Officer of PTC, and the owner of 25% of its issued and outstanding stock.

7.      Upon information and belief, the Defendants regularly conduct business in this judicial district, Defendant Walker resides in this district, and a substantial part of the events giving rise to this action occurred in this judicial district. Defendants' closely held corporation, PTC, through which Defendants have engaged in many of the actions complained of herein, had its principal place of business in this district at all relevant times and had, as alleged below, successfully obtained the transfer to this district of a prior related action brought against it by AT&T Corp on the grounds that relevant evidence and witnesses were located within this district.

8.      The amount in controversy in this action exceeds the sum of $75,000.00, exclusive of interest and costs.

9.      This Court has original jurisdiction over this action under 18 U.S.C. § 1964(c) and 28 U.S.C. §§ 1331, 1332, and has supplemental jurisdiction under 28 U.S.C. § 1367.

COMPLAINT                           - 3 -
Case No. 04-CV-_____

10.     Venue is proper in this Court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

<u>Allegations Common To All Claims For Relief</u>

<u>The North Pacific Cable</u>

11.     The North Pacific Cable ("NPC") is a trans-Pacific undersea fiber optic telecommunications cable between Japan and Oregon, with a branch or "spur" to Alaska (the "Alaska Spur").

12.     The NPC was constructed by PTC (then known as Pacific Telecom Cable, Inc.), Cable & Wireless plc ("C&W") (an English company) and International Digital Communications Inc. ("IDC") (a Japanese company) pursuant to a so-called Construction and Maintenance Agreement ("C&MA") dated February 2, 1989. These three entities (known as the "Founding Signatories") initially owned 100% of the NPC's capacity (PTC owning 100% of the U.S. End, including the Alaska Spur, and IDC and C&W owning 100% of the Japanese End), but then sold at a profit portions of their capacity to other telecommunications carriers, including AT&T. The NPC went into service in May 1991.

13.     C&W and IDC were telecommunications carriers. C&W originally owned a minority stake in IDC, but subsequently acquired 100% of that company, which was re-named Cable & Wireless IDC, Inc. C&W and IDC are hereinafter jointly referred to as C&W, without distinction between the individual corporate entities.

14.     At the time the NPC was built, PTC was owned 80% by Pacific Telecom, Inc., an American telecommunications carrier, and 20% by C&W.

COMPLAINT                                    - 4 -
Case No. 04-CV-_____

15.    Sales of capacity on the NPC occurred in one of two ways. Until May 1991, when the NPC went into service, a carrier could become an Additional Signatory to the C&MA by executing a Supplemental Agreement. After the NPC went into service, a carrier could acquire capacity by entering into an Indefeasible Right of User Interest Agreement ("IRU").

16.    AT&T Corp acquired from PTC a total of 2070 circuits on the "U.S. End" of the NPC pursuant to Supplemental Agreements and IRUs, and Alascom, Inc. acquired from PTC the entire capacity of the Alaska Spur, equating to 5670 circuits, pursuant to a Supplemental Agreement. AT&T paid PTC in excess of $75 million for this capacity.

<u>The Obligation to Share Operations and Maintenance Costs</u>

17.    Once an undersea cable such as the NPC has been built, operating and maintaining the cable consists of activities such as monitoring the cable and associated equipment, and paying bills for such items as cableship services, electricity, rent and storage of spare parts. The vast bulk of the costs consist of the fees paid for one or more cableships to stand by in case a repair is needed ("standing costs") and to actually steam out to repair faults in the cable when necessary ("running costs").

18.    Historically, undersea cables are built by a consortium of carriers who share, on a pro rata basis, the actual costs of operating and maintaining the cable, which costs are passed through to them without any profit mark-up by the carrier or carriers designated as the "Maintenance Authority." In marketing capacity on the NPC, PTC touted its similarities to traditional consortium cables, noting that the Founding Signatories were all carriers or the

COMPLAINT                    - 5 -
Case No. 04-CV-_____

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

affiliate of a carrier, and represented that PTC would conform to the historical practice of consortium cables in billing for O&M, namely, to share the actual operations and maintenance ("O&M") costs on a pro rata basis.

19.    In drafting both the C&MA and the IRUs, PTC used language completely consistent with the historical practice of passing through actual O&M costs on a pro rata basis. Pursuant to the provisions of the C&MA, the Founding Signatories (i.e., PTC and C&W) constitute the "Maintenance Authority" and are jointly responsible for maintaining the undersea portions of the NPC. The C&MA provides that the costs incurred by the Maintenance Authority for maintaining the undersea portion of the NPC are to be shared by all owners of NPC capacity in specified percentages. In addition, the C&MA provides that the costs incurred within the United States by PTC in operating and maintaining the U.S. land-based portions of the NPC (i.e., the cable landing stations and cable beach joints) are to be shared by the owners of capacity on the U.S. End of the NPC in specified percentages. Similarly, purchasers of IRUs for capacity on the U.S. End of the NPC are obligated to pay PTC their share of operation and maintenance costs.

20.    When the NPC went into service in 1991, PTC, as a member of the Maintenance Authority and the provider of the NPC's land-based facilities in the United States, periodically billed AT&T and the other owners of capacity on the U.S.End of the NPC for what it represented to be their shares of the actual O&M costs incurred. In reality, however, PTC did not simply pass through the actual costs incurred in operating and maintaining the NPC, as required by the

COMPLAINT
Case No. 04-CV-_____

- 6 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

governing agreements. Without disclosing that it was doing so, PTC included in its O&M invoices a mark-up of the actual costs.

The Defendants Acquire Control of PTC

21.    Each of the Defendants was among the very earliest of PTC's employees, and each held a senior position with PTC during the period when the NPC was being planned and built. In addition, Defendants Walker and Gunsel remained in PTC's employ for approximately two years after the NPC went into service. After leaving the employ of PTC, all of the Defendants continued to work in the undersea telecommunications cable industry.

22.    By virtue of their employment at PTC and their subsequent experience in the undersea telecommunications cable industry, each of the Defendants was familiar with the industry practice that O&M charges constitute only a pass-through of actual costs. By virtue of their employment at PTC, as well as by virtue of subsequent access to the records of PTC, each of the Defendants was aware that PTC had represented to prospective purchasers of capacity on the NPC that it would conform to industry practice regarding O&M charges. By virtue of their employment at PTC, as well as by virtue of subsequent access to the records of PTC, each of the Defendants was aware of the provisions of the C&MA and the IRUs.

23.    In addition, however, by virtue of their employment at PTC, each of the defendants was also aware that PTC had in fact been billing O&M charges that exceeded actual costs without disclosing the overcharges to AT&T. The Defendants knew that, under the terms of the C&MA, only the Founding Signatories had the right to audit the books and records of the

COMPLAINT                    - 7 -
Case No. 04-CV-_____

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

Maintenance Authority, and consequently that purchasers of NPC capacity had to rely on the honesty and integrity of the Founding Signatories to bill only the actual costs of O&M.

24.     When Pacific Telecom, Inc. decided in 1997 to exit the undersea cable business by selling PTC, the Defendants saw an opportunity to make a financial killing by acquiring PTC for themselves and vastly increasing the amount of clandestine O&M overcharges.

25.     Not having sufficient resources of their own to purchase PTC, the Defendants decided to use as a vehicle a joint venture company known as Neptune Communications, LLC ("Neptune Communications").   28.5% of Neptune Communications was owned by Neptune Global Systems, LLC ("Neptune Global Systems"), a company controlled by the Defendants, and 71.5% was owned by investment entities affiliated with The Carlyle Group, a private equity firm.

26.     Neptune Communications, through its wholly-owned subsidiary Neptune Pacific Holdings, Inc. ("Neptune Pacific Holdings"), acquired Pacific Telecom, Inc.'s 80% interest in PTC, as well as C&W's 20% interest, on May 18, 1998.   The acquisition was financed principally through capital contributed by The Carlyle Group entities and bank loans.

27.     Immediately after the closing of the acquisition of PTC, or soon thereafter, Schroeder was appointed Chairman of the Board of PTC and a Director of PTC.  Walker was appointed President and CEO of PTC, and a Director of PTC, and Gunsel was appointed Vice President, Treasurer and Assistant Secretary of PTC and a Director of PTC.

COMPLAINT
Case No. 04-CV-_____

- 8 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

28.    Upon information and belief, the bank loans were repaid from funds generated by the sale of the remaining capacity owned by PTC in the U.S. End of the NPC.  Upon the repayment of those loans, PTC was debt free.  However, PTC had no further inventory of NPC capacity which it could sell for a profit.  Since it was not entitled to make a profit on O&M, PTC had only two lines of business where it could legitimately make a profit, namely, provision of backhaul and restoration services.  The revenue potential from these lines of business was relatively small, and the Defendants had aspirations far in excess of what those lines of business could produce.

### The 1999 Loan and Dividends

29.    At this point, the Defendants could have simply sat back and enjoyed the enormous illegitimate profits generated every year by fraudulently inflating O&M invoices.  Instead, they decided to monetize the future revenue stream to be generated by this fraudulent billing, cash out The Carlyle Group interests, gain sole control of PTC for themselves, and in the process rake in a quick $12 million or so.

30.    Pursuant to a Note Purchase Agreement dated June 17, 1999, PTC jointly and severally issued $46.7 million of Senior Secured Notes (the "Notes"), payable in 28 semiannual installments at a fixed interest rate of 7.35%, to a group of insurance company lenders (the "Lenders").  The Notes were secured by liens on essentially all of PTC's assets, including its accounts receivable.  The Note Purchase Agreement was negotiated and executed in New York, is governed by New York law, requires the maintenance of a liquidity reserve of $1.7 million in New York, and provides that installment payments on the Notes be made by PTC in New York.

COMPLAINT                                - 9 -
Case No. 04-CV-_____

31.    PTC, however, received no portion of the proceeds of the $46.7 million loan, despite having incurred the liability to repay the debt.  Instead, the entire net proceeds of the loan (after deducting transaction costs and a $1.7 million liquidity reserve) went to PTC's parent company, Neptune Pacific Holdings.  Neither Neptune Pacific Holdings nor PTC used any portion of the loan for purposes related to the NPC or as working capital of any kind.

32.    Within days of execution of the Note Purchase Agreement, Neptune Pacific Holdings declared a dividend of $43 million.  Subsequently, in December 1999, it declared a further dividend in the amount of $1.25 million.  Thus, the entire net proceeds of the $46.7 million loan was used to pay dividends to the shareholders of Neptune Pacific Holdings.  Ultimately, through subsequent upstreaming, most of those dividends wound up in the pockets of the Defendants and the various Carlyle Group entities.

33.    Upon information and belief, the Defendants informed the Lenders, and the Lenders understood, that the primary source of revenues from which the Notes would be paid would be PTC's profits from O&M charges to the carriers such as AT&T, notwithstanding that the agreements governing the O&M charges did not permit any profits inasmuch as the O&M charges were required to be solely a pass-through of actual costs incurred.

34.    One condition of the loan was the Lender's receipt of a solvency opinion.  The Lenders in fact received such a solvency opinion from Kane Reece Associates, Inc. ("Kane Reece") dated June 16, 1999, opining that Neptune Pacific Holdings and its subsidiaries, including PTC, were solvent and that, after giving effect to the transactions contemplated in the

COMPLAINT
Case No. 04-CV-_____

- 10 -

Note Purchase Agreement, including the payment of dividends, those companies (a) had assets with a present fair saleable value that exceeded their pro forma liabilities; (b) would be able to pay their debt obligations and liabilities as such obligations became due in the usual course of business; and (c) would not have an unreasonably small capital base with which to conduct business. Upon information and belief, that opinion was a complete sham and Defendants knew that its conclusions were false.

35.    Upon information and belief, the Kane Reece solvency opinion was based solely on the assumption that PTC was entitled to make substantial profits on its O&M charges to carriers such as AT&T and, indeed, to charge the carriers amounts sufficiently in excess of the actual O&M costs to enable PTC to repay the principal and interest on the $46.7 million loan. By assuming that PTC's cash flow from O&M charges included a substantial element of profit for PTC, Kane Reese's discounted cash flow analysis concluded that PTC had an excess of fair saleable value of assets over liabilities (including the $46.7 million debt to the Lenders).

36.    The Kane Reece solvency opinion had no basis in fact. O&M costs are not deemed to include, in the undersea cable industry generally, or in the C&MA and IRUs for the NPC in particular, anything more than the actual costs incurred in operating and maintaining the cable.

37.    Upon information and belief, the Defendants knew that the Kane Reece solvency opinion was ill-founded for at least the following reasons:

COMPLAINT                            - 11 -
Case No. 04-CV-_____

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

(a)  Kane Reece was not a disinterested expert.  Upon information and belief, Defendant Schroeder recommended that the Lenders retain Kane Reece to provide the solvency opinion not because it had any experience in the undersea cable industry, but because its principals had long-standing relationships with Schroeder and because it had previously performed work for PTC.

(b)  Kane Reece had no experience in the undersea cable industry, and relied upon the Defendants as the basis for its opinion on industry practice.

(c)  Upon information and belief, the Defendants knew that Kane Reece contacted neither carriers who owned capacity on the NPC, nor carriers who owned capacity on other undersea cables, to determine what the term "operation and maintenance costs" means in the undersea cable industry.  (Had it done so, it would have found that the term means only the costs actually incurred in operating and maintaining a cable.)

(d)  The Defendants knew that neither the IRUs and C&MA relating to the NPC, nor the operative agreements for other cables which Kane Reece claims to have reviewed, support its assertion that "operations and maintenance costs" means anything other than costs actually incurred in operating and maintaining a cable.

38.    Because Defendants knew that PTC could not justifiably charge carriers such as AT&T anything more than their respective shares of the actual operations and maintenance costs incurred, they knew that PTC had no legitimate income stream from which it could repay the

COMPLAINT
Case No. 04-CV-_____

- 12 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

$46.7 million loan. They thus knew that PTC would be rendered insolvent when it incurred a debt of $46.7 million without receiving fair – indeed any – consideration.

The Defendants Gain Sole Control of PTC

39.     Upon information and belief, the dividends received by The Carlyle Group entities from the proceeds of the $46.7 million loan amounted to over $31 million.  Taken together with dividends previously received from the proceeds of PTC's sale of the remainder of its inventory of NPC capacity, The Carlyle Group entities had, upon information and belief, realized over $40 million on their investment of approximately $5 million in less than two years. With Neptune Pacific Holdings (the only asset of Neptune Communications) now saddled with $46.7 million in debt, The Carlyle Group entities were ready to exit the stage.

40.     In October of 2000, Neptune Global Systems (then owned solely by Defendants) purchased the 71.5% interest of The Carlyle Group entities in Neptune Communications (the sole owner of Neptune Pacific Holdings, which, in turn, was the sole owner of PTC) for a mere $1.35 million.

41.     After acquiring sole control of Neptune Communications, the Defendants reorganized the ownership structure of Neptune Communications and its subsidiaries. Neptune Communications was merged into Neptune Global Systems.  Then Neptune Pacific Holdings was merged into PTC.  These steps resulted in Neptune Global Systems becoming the direct parent of PTC.  Finally, Neptune Global Systems distributed its shares of PTC to the Defendants. As a result of the restructuring, effected in December 2000, Defendant Schroeder personally

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

owns 50% of the stock of PTC, and Defendants Walker and Gunsel each owns 25%. In addition, as a result of the merger of Neptune Pacific Holdings into PTC, PTC is the sole entity liable for repayment of the $46.7 million loan.

### Defendants' Inflated O&M Billing

42.    With its inventory of NPC capacity depleted, the profit on backhaul and restoration services paltry, and proper O&M charges restricted to recoupment of actual costs, PTC did not have sufficient sources of legitimate revenue to repay the $46.7 million loan, or from which to continue to pay the Defendants dividends.

43.    For the Defendants, however, this was not a problem. They simply caused PTC to continue its practice of billing AT&T and the other carriers more than the actual costs of providing O&M — only now Defendants significantly increased the level of overbilling. That Defendants were successful is evidenced by the fact that until quite recently PTC kept up its payments to the Lenders, as well as its trade creditors, and even managed to pay the Defendants hefty salaries and at least an additional $2 million in dividends. Defendants managed to accomplish this despite the fact that several carriers went bankrupt and ceased to pay O&M invoices.

44.    Since 1998, Defendants have personally determined how much PTC would charge AT&T and the other carriers for O&M. Upon information and belief, Defendants intentionally set the level of those charges well in excess of the actual costs incurred by PTC in operating and maintaining the NPC, even though they knew that doing so was a violation of the

COMPLAINT
Case No. 04-CV-_____

- 14 -

governing contracts and even though they knew that AT&T and the other carriers understood they were being charged only the actual costs of providing O&M.

45.    Upon information and belief, since 1998 Defendants have caused PTC to render deceptive invoices that appeared to bill AT&T and the other carriers only for their share of actual O&M expenses, when in fact the amounts billed far exceeded the actual expenses.

46.    Upon information and belief, Defendants have caused PTC to affirmatively misrepresent the nature of the O&M charges billed and/or to conceal the information from which AT&T and the other carriers could have determined that they were being overcharged for O&M.

47.    The empire that Defendants built ultimately proved to be a house of cards. As a result of an oversupply of cableships, prices for cableship services have fallen dramatically in the past few years. Since the cost of cableships represent by far the largest portion of O&M expenses, AT&T expected its share of O&M costs on the NPC to fall as a consequence of this industry situation (and, in fact, PTC's cableship costs had been reduced tremendously). Yet PTC's O&M billings remained the same, or even grew. When AT&T raised its concerns with Schroeder and Walker, and finally refused to pay further O&M invoices until it received a satisfactory explanation, the house of cards began to fall apart.

48.    In March 2003, AT&T Corp commenced an action against PTC in the United States District Court for the District of New Jersey seeking, *inter alia*, to recover the overpayments it had made with respect to its IRU circuits by reason of PTC's inflated billings. PTC subsequently commenced is own action against AT&T Corp and Sprint Communications

COMPLAINT                                    - 15 -
Case No. 04-CV-_____

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

Company LP ("Sprint") (which had likewise stopped paying PTC's O&M invoices believing that they were improperly inflated) in the United States District Court for the Western District of Washington. (Because, unlike the IRUs, the C&MA contained an arbitration clause, the issues of payment and overcharges for circuits acquired under the C&MA are the subject of a pending International Chamber of Commerce arbitration between PTC and numerous other carriers, including AT&T and Sprint.) AT&T Corp's New Jersey action was transferred and consolidated with PTC's Washington action under the caption, *PT Cable, Inc. v. Sprint Communications Company, LP and AT&T Corporation*, No. 03-CV-5202FDB (the "Prior Action").

49.    By Order entered September 22, 2004, AT&T and Sprint were granted Summary Judgment in the Prior Action. Judge Burgess's Order found that the IRUs (and, implicitly, the C&MA) were plain and unambiguous in permitting PTC to bill capacity owners only their respective shares of the actual costs incurred in operating and maintaining the NPC. Therefore, the Court awarded AT&T Corp damages plus interest totaling $5,597,374.00 with respect to O&M overcharges by PTC in connection with AT&T Corp's IRUs. No part of the resulting judgment in AT&T's favor has been paid. In light of the fact that PTC has effectively ceased doing business and all of its assets are purportedly subject to the security interest of the Lenders, there is currently no reasonable prospect that AT&T will be able to collect its judgment against PTC.

50.    Defendants herein are officers of PTC and were the individuals responsible for directing and managing PTC's defense of AT&T's claims in the Prior Action. Therefore, the September 22, 2004, Order and subsequent judgment in the Prior Action is conclusive and

COMPLAINT                                - 16 -
Case No. 04-CV-_____

binding upon Defendants herein, as a matter of both *res judicata* and collateral estoppel, and the fact of PTC's overcharges is thus established. The primary question presented by this action is the full extent of PTC's overcharges and Defendants' responsibility and liability for the same.

51. By reason of Defendants' intentional concealment of their activities, it was only through discovery in the Prior Action that AT&T learned of the transactions described above, the Defendants' role therein, and the manner in which the Defendants personally profited from the fraud which they perpetrated through PTC. Much of the evidence supporting the allegations contained herein is subject to a protective order in the Prior Action and is therefore not pleaded specifically herein. To the extent that the Court deems it necessary to plead such evidence specifically, AT&T requests leave to file a supplement to this Complaint under seal.

### AS AND FOR A FIRST CLAIM FOR RELIEF
(Fraud)

52. AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 51 above, as if set forth in full again herein.

53. Each and every invoice issued to AT&T by PTC for O&M charges contained a representation as to the total costs incurred for each of several categories of operations and maintenance expense. For example, every invoice contained a "submarine" category which purportedly represented the total amount incurred by PTC for standing costs, as well as AT&T's share of that total amount. In fact, the total amount for standing costs was grossly inflated and, hence, AT&T's share of the cost was also inflated.

COMPLAINT
Case No. 04-CV-_____

- 17 -

54.    At least since May 1998, when they became officers and directors of PTC, the Defendants were directly responsible for, and participated in, determining the amounts by which the invoices issued to AT&T would overstate the actual costs incurred in operating and maintaining the NPC.

55.    The Defendants knew that AT&T would rely upon the invoices issued by PTC as accurately stating the total O&M costs incurred, because Defendants knew that AT&T had no choice but to rely on those statements, given that AT&T had no independent access to PTC's books and records documenting the actual costs and no way to verify the correctness of the amounts reflected on the invoices.

56.    AT&T in fact did rely upon the false representations contained in the invoices by paying in full each and every invoice issued by PTC through the invoice corresponding to the third quarter of 2002, in the case of AT&T Corp, and through the invoice corresponding to the third quarter of 2003, in the case of Alascom, Inc.

57.    AT&T has been damaged by reason of the fraud perpetrated by Defendants in an amount to be determined at trial.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty)

58.    AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 57 above, as if set forth in full again herein.

COMPLAINT
Case No. 04-CV-_____

- 18 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

59.    By reason of PTC's status as a Founding Signatory and a member of the Maintenance Authority, PTC had the responsibility to ensure that the NPC was operated and maintained in a sound, efficient and economical manner.

60.    Further, by reason of PTC's status as a Founding Signatory and a member of the Maintenance Authority, PTC had access to the books and records documenting the actual costs incurred in operating and maintaining the NPC.  Such access to the underlying cost information was denied to AT&T.  Therefore, AT&T had no choice but to rely on PTC and the other Founding Signatories and members of the Maintenance Authority to ensure that the NPC was operated and maintained in a sound, efficient and economical manner and that AT&T was billed only its proper share of the actual costs reasonably and necessarily incurred in operating and maintaining the NPC.

61.    PTC breached its fiduciary duties to AT&T and the other carriers which owned capacity on the NPC by violating the trust and confidence reposed in it to ensure that AT&T and the other carriers were charged only their proper shares of the actual costs reasonably and necessarily incurred in operating and maintaining the NPC, and by intentionally inflating the charges billed to AT&T and the other carriers so that PTC and its shareholders could benefit themselves.

62.    The Defendants knowingly aided and abetted PTC's breaches of fiduciary duty by authorizing, approving and directing the issuance of inflated invoices to AT&T.

COMPLAINT
Case No. 04-CV-_____

- 19 -

63.     AT&T has been damaged by reason of the breaches of fiduciary duty aided and abetted by the Defendants in an amount to be determined at trial.

AS AND FOR A THIRD CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

64.     AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 63 above, as if set forth in full again herein.

65.     If PTC was not then already insolvent, PTC was rendered insolvent or pushed to the brink of insolvency by incurring the debt for the Notes, and/or by issuing dividends and other payments to the Defendants or entities controlled by them.

66.     AT&T, by reason of having paid improperly inflated invoices issued by PTC prior to the time that PTC became insolvent or reached the brink of insolvency, was entitled to repayment of its overpayments and was thus a creditor of PTC.

67.     Defendants, as officers and directors of PTC in and after May 1998, owed creditors, including AT&T, a fiduciary duty to ensure that corporate assets were not wasted and that monies that could have been used to pay creditors were not diverted.

68.     Defendants breached their fiduciary duty to AT&T by, *inter alia*, causing PTC to issue the Notes, declare dividends, and divert monies to themselves and entities they controlled.

69.     AT&T has been damaged by Defendants' breaches of their fiduciary duties in amounts to be determined at trial.

COMPLAINT
Case No. 04-CV-_____

- 20 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Piercing the Corporate Veil)

70.    AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 69 above, as if set forth in full again herein.

71.    Defendants operated PTC solely for their own personal benefit and as a vehicle for fraud in order to directly, unfairly and inequitably benefit themselves by, *inter alia*, causing PTC to obtain from AT&T and other carriers funds to which it was not entitled, siphoning off those funds by paying themselves dividends and otherwise, fraudulently transferring PTC's assets and causing PTC to become insolvent.

72.    By reason of the foregoing conduct, PTC has been, upon information and belief, undercapitalized and rendered unable to pay the judgment against it obtained by AT&T Corp in the Prior Action because the monies necessary to pay the judgment have been siphoned off by Defendants for their personal benefit.

73.    Therefore, AT&T is entitled to "pierce the corporate veil" and to recover from Defendants the amount of the judgment entered in favor of AT&T in the Prior Action and, to the extent not duplicative, the overpayments made to PTC by reason of PTC's improperly inflated invoices in the amounts to be determined at trial.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Constructive Fraudulent Conveyances)

74.    AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 73 above, as if set forth in full again herein.

COMPLAINT
Case No. 04-CV-_____

- 21 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

75.     By reason of Defendants having caused PTC to enter into the Note Purchase Agreement, pledge its assets, pay professional and transaction fees, pay dividends, and engage in other transactions, PTC was rendered insolvent, its insolvent condition was exacerbated, or it was left with unreasonably small assets and capital in relation to its business, and was left with more debt than it would be able to pay as it became due.

76.     The Defendants fraudulently conveyed PTC's assets and had PTC fraudulently incur obligations by reason of Defendants having caused PTC to enter into the Note Purchase Agreement, pledge all or substantially all of its assets to the Lenders, pay professional and transaction fees in connection with the Note Purchase Agreement, and pay dividends.

77.     PTC was or was rendered insolvent, was left with unreasonably small capital, and was left with debt beyond its ability to pay as it became due.

78.     Defendants caused PTC to convey its assets and incur obligations without receiving fair consideration through, *inter alia*, the Note Purchase Agreement, pledges of all or substantially all or its assets to the Lenders, payments of professional and transaction fees in connection with the Note Purchase Agreement, and payments of dividends.

79.     Defendants' wrongful conduct as alleged above has damaged AT&T in amounts to be determined at trial, and such fraudulent conveyances should be voided pursuant to the New York Debtor and Creditor Law and other applicable law.

COMPLAINT
Case No. 04-CV-_____

- 22 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

80.     In voiding the fraudulent conveyances and determining the amounts received by Defendants through the fraudulent conveyances, the intermediate corporate entities at certain times interposed between PTC and Defendants should be collapsed and disregarded.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Actual Fraudulent Conveyances)

81.     AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 80 above, as if set forth in full again herein.

82.     Upon information and belief, the Defendants engaged in the foregoing transactions with the actual intent to hinder, delay or defraud creditors inasmuch as Defendants knew that the foregoing transactions were fraudulent conveyances as to creditors such as AT&T in that Defendants caused PTC to convey its assets and incur obligations without receiving fair consideration, and rendered PTC insolvent, increased its insolvency, or left it with unreasonably small capital, and left PTC with more debt than it would be able to pay as it became due.

83.     Defendants' wrongful conduct as alleged above has damaged AT&T in amounts to be determined at trial, and such fraudulent conveyances should be voided pursuant to the New York Debtor and Creditor Law and other applicable law.

84.     In voiding the fraudulent conveyances and determining the amounts received by Defendants through the fraudulent conveyances, the intermediate corporate entities at certain times interposed between PTC and Defendants should be collapsed and disregarded.

COMPLAINT
Case No. 04-CV-_____

- 23 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

AS AND FOR A SEVENTH CLAIM FOR RELIEF
(Violation of Rackeeter Influenced and Corrupt
Organizations Act (18 U.S.C. § 1962(c))

85.     AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 84 above, as if set forth in full again herein.

86.     Defendants engaged in a pattern of continuous and related racketeering activity by causing PTC to submit to AT&T and to other carriers fraudulently inflated invoices every quarter from the time that they became officers and directors of PTC, in or about May 1998, continuing into the year 2004.

87.     Each of the fraudulent invoices submitted by PTC to AT&T was transmitted through the United States mails in furtherance of a scheme or artifice to defraud and to obtain money by false representations in violation of 18 U.S.C. § 1341.

88.     Each of the fraudulent invoices caused AT&T and, upon information and belief, other telecommunications carriers, to transmit payment of the fraudulent invoices back to PTC either by use of the United States mails in furtherance of Defendants' scheme or artifice to defraud and their scheme to obtain monies by means of false representations in violation of 18 U.S.C. § 1341, or by means of wire transfers in furtherance of Defendants' scheme or artifice to defraud and their scheme to obtain monies by false representations in violation of  18 U.S.C. § 1343.

COMPLAINT
Case No. 04-CV-_____

- 24 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

89.    PTC obtained payment with respect to each of its fraudulent invoices from AT&T and, upon information and belief from other carriers, from accounts at United States financial institutions in violation of 18 U.S.C. § 1344.

90.    Defendants, with knowledge that the payments received from AT&T and others were obtained by fraud, caused the fraudulently obtained monies to be transported in interstate commerce including, *inter alia*, by causing the carriers' checks in payment of the fraudulent invoices to be sent to the out-of-state drawee banks for collection, thus violating 18 U.S.C. § 2314.

91.    PTC constituted the "enterprise" through which Defendants engaged in the aforementioned pattern of racketeering activity.

92.    The activities of PTC in operating and maintaining the NPC and in sending invoices to, and receiving payment from, AT&T and other carriers affected interstate and foreign commerce.

93.    AT&T has been injured in its business and has sustained damages by reason of Defendants' above-described pattern of racketeering activity in amounts to be determined at trial, and is entitled to recover treble its actual damages plus its reasonable attorneys' fees.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### (Illegal Dividends)

94.    AT&T repeats and realleges each and every allegation contained in paragraphs 1 through 93 above, as if set forth in full again herein.

COMPLAINT
Case No. 04-CV-_____

- 25 -

Davis Wright Tremaine LLP
LAW OFFICES
1501 Fourth Avenue · Suite 2600
Seattle, Washington 98101-1688
(206) 622-3150 · Fax: (206) 6287699

95.    PTC and Neptune Pacific Holdings are, or were, corporations incorporated in the State of Delaware.

96.    Defendants, as Directors of PTC and/or Neptune Pacific Holdings, have caused each of those entities to declare and pay dividends in violation of Delaware General Corporation Law §§ 170, 173 and 174 because those dividends were not paid out of either the entities' surplus, or out of net profits earned in the year the dividends were paid or the preceding year.

97.    AT&T is and at all relevant times was a creditor of PTC, into which Neptune Pacific Holdings merged in 2000.

98.    AT&T has been damaged by reason of the improper dividends, in an amount to be determined at trial, because such dividends have left PTC with insufficient assets to pay the amounts owed to AT&T.

WHEREFORE, AT&T Corp and Alascom, Inc. pray for judgment against Defendants voiding the fraudulent conveyances pleaded in the Fifth and Sixth Claims for Relief and, on each of their claims for relief, awarding them:

A.    Their actual damages in an amount to be determined at trial, but in no event less than $13,000,000 (and trebling the said damages on the Seventh Claim for Relief);

B.    Imposition of a constructive trust upon any property obtained with proceeds from Defendants' wrongdoing as alleged herein;

C.    Punitive damages in an amount to be determined at trial;

D.    Interest, the costs of action, and reasonable attorneys' fees; and

COMPLAINT                                    - 26 -
Case No. 04-CV-_____

E.    Such other and further relief as the Court deems just and proper.

Dated: October 20, 2004                      Respectfully submitted,

                                             DAVIS WRIGHT TREMAINE L.L.P.


                                             By:  /s/ Daniel M. Waggoner
                                             Daniel M. Waggoner, WSBA #9439
                                             Scott Carter-Eldred, WSBA #32881
                                             1501 Fourth Avenue, Suite 2600
                                             Seattle, WA  98101
                                             Telephone: (206) 622-3150
                                             Facsimile: (206) 628-7699

                                                     - and-

                                             FULBRIGHT & JAWORSKI L.L.P.
                                             Joseph P. Zammit
                                             Edward Dolido
                                             666 Fifth Avenue
                                             New York, NY  10103-3198
                                             Telephone:  (212) 318-3000
                                             Facsimile:  (212) 318-3400

                                             Attorneys for Plaintiffs

COMPLAINT                          - 27 -              Davis Wright Tremaine LLP
Case No. 04-CV-_____                                        LAW OFFICES
                                                        1501 Fourth Avenue · Suite 2600
                                                        Seattle, Washington 98101-1688
                                                     (206) 622-3150 · Fax: (206) 6287699