1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
9                    AT TACOMA

10   AT&T CORP. and ALASCOM, INC. d/b/a
     AT&T Alascom, Inc.,
11
                                                    Case No. C04-5709FDB
12              Plaintiffs,
                                                    ORDER GRANTING IN PART AND
13        v.                                        DENYING IN PART DEFENDANTS'
                                                    MOTION TO DISMISS and
14   DAVID W. WALKER, DONALD J.                     STAYING CASE
     SCHROEDER, and TERRY A. GUNSEL,
15
                Defendants.
16
                              **INTRODUCTION**
17
           This case grows out of an agreement between the parties concerning the costs of operating
18
     and maintaining an undersea telecommunications cable.  In an earlier case before this Court in which
19
     PT Cable (PTC) sued AT&T and Sprint for failure to pay their share of operation and maintenance
20
     costs (O&M), AT&T and Sprint counter-claimed for breach of contract, contending that PTC billed
21
     them for more than their fair share of actual O&M expenses under their Indefeasible Right of User
22
     Interest Agreements.  This Court agreed that PTC breached the Agreements with AT&T and Sprint,
23
     and awarded damages in the amount of the overcharges.  (*PT Cable v. Sprint*, Case No. C03-
24
     5202FDB.)
25

26   ORDER - 1

In the case presently before the Court, AT&T and Alascom Inc. (a wholly owned subsidiary of AT&T) (AT&T) sue David W. Walker, President and Chief Executive Officer and Director of PTC, owning 25% of its stock and residing in Vancouver, Washington; Donald J. Schroeder, Chairman and Director of PTC, owning 50% of its stock and residing in Fernandina Beach, Florida; and Terry A. Gunsel, Treasurer and Chief Financial Officer and Director of PTC, owning 25% of its stock, and residing in Newton, Pennsylvania.  AT&T recites eight claims for relief in its Complaint:

1.    Fraud: inflated charges in invoices misrepresenting the amount of O&M charges.

2.    Aiding and abetting breach of fiduciary duty: the individual defendants aided and abetted PTC's breaches of fiduciary duty by authorizing, approving and directing the issuance of inflated invoices to AT&T.

3.    Breach of fiduciary duty: Defendants caused PTC to issue the notes, declare dividends, and divert monies to themselves and entities they controlled, when as officers and directors of PTC they had a fiduciary duty to ensure that corporate assets were not wasted and that monies that could have been used to pay creditors were not diverted.

4.    Piercing the corporate veil: Defendants used PTC as a vehicle for fraud to benefit themselves, in that they fraudulently transferred PTC's assets, and they obtained funds from AT&T and other carriers to which PTC was not entitled, which funds were paid to themselves as dividends.  Thus, AT&T asserts that it is entitled to pierce the corporate veil to recover judgment entered in its favor in the prior action to the extent not duplicative and other overpayments made pursuant to the invoices.

5.    Constructive fraudulent conveyances: Defendants having caused PTC to enter into the Note Purchase Agreement, pledge its assets, pay professional and transaction fees, pay dividends, and engage in other transactions, rendered PTC insolvent or left it with unreasonably small capital to pay its debts as they became due;

ORDER - 2

6. <u>Actual fraudulent conveyances</u>: Defendants engaged in the foregoing transactions with the actual intent to hinder, delay, or defraud creditors.

7. <u>Violation of Racketeer Influenced and Corrupt Organizations Act</u>: Defendants engaged in a pattern of continuous and related racketeering activity in causing PTC to submit to AT&T and other carriers fraudulently inflated invoices every quarter from the time they became officers and directors of PTC in about May 1998 continuing into the year 2004.

8. <u>Illegal Dividends</u>: As Directors of PTC and/or Neptune Pacific Holdings (into which PTC merged in 2000), have caused those entities to declare and pay dividends in violation of Delaware General Corporation Law because the dividends were not paid out of either the entities' surplus or out of net profits earned in the year the dividends were paid or the preceding year.

Defendants move to dismiss all of AT&T's claims for the following reasons:  (1) "derivative claims" (Third, Fourth, Fifth, Sixth, and Eighth claims) for lack of standing; (2) the second claim, aiding and abetting breach of fiduciary duty, as a purely contractual relationship did not give rise to a fiduciary relationship; (3) the first claim (fraud) on the grounds of failure to state a claim and that it is barred by the economic loss doctrine; (4) the seventh claim (RICO) for failure to state a claim.

PTC is presently in bankruptcy proceedings pending before Bankruptcy Judge Paul B. Snyder, pursuant to an involuntary bankruptcy petition filed against PTC on January 5, 2005.  The interim trustee in the PTC Chapter 7 bankruptcy filed a declaration in this case regarding the Third, Fifth, Sixth and Eighth Claims for relief, which seek to recover dividends received by the Defendants either as actual or constructive fraudulent conveyances, breaches of fiduciary duty, and/or illegal dividends.  The Interim Trustee states that he believes that those causes of action, which concern over $40 million in dividends paid to the Defendants and other parties, may constitute the primary asset and source of recovery for the creditors of PTC in the bankruptcy case.  The Interim Trustee

ORDER - 3

1   states that he is presently gathering records and is considering moving to intervene in this action or

2   filing a separate action on behalf of PTC's bankruptcy estate, and asks the Court, therefore, not to

3   dismiss the claims but to stay the claims pending his determination whether to pursue them on behalf

4   of the PTC bankruptcy estate for the benefit of PTC's creditors.

5       AT&T agrees that the Third, Fifth, Sixth, and Eighth Claims should be stayed.  Defendants

6   argue that the entire case should be stayed pending the Bankruptcy Trustee's decision in order to

7   avoid having to readdress issues presented in Defendants' motion to dismiss.

8                             **DISCUSSION**

9       As reflected in the following discussion, AT&T's First Claim for fraud and Second Claim of

10   aiding and abetting breach of fiduciary duty must be dismissed; Defendants' Motion To Dismiss is

11   otherwise denied.  The remainder of the case is stayed pending decision of the Bankruptcy Trustee to

12   intervene.

13   **First Claim:  Fraud**

14       As concluded in the discussion below,  the economic loss doctrine bars AT&T's fraud claim

15   based upon inflated charges in invoices misrepresenting the amount of actual O&M charges.

16       AT&T acknowledges that earlier, in its breach of contract case, it received a judgment from

17   this Court for overpayments attributable to the IRUs alone, but states that its present damage

18   calculation is based on both the IRUs and the C&MA and that although there is overlap, it has not

19   collected any portion of its judgment against PTC and PTC is now in bankruptcy, and there will be

20   no double recovery.

21       Defendants move for dismissal of the fraud claim arguing that (1) the fraud claims arise from

22   a breach in performance of the contract and sound in contract, not tort; (2) AT&T fails to allege

23   damages from fraud, rather than from breach of contract; and (3) AT&T fails to plead fraud with the

24   specificity required by Rule 9(b).

25       The parties agree that the law of New Jersey applies.

26   ORDER - 4

1    Defendants' first argument – that the contract sounds in contract, not tort – implicates the

2    economic loss doctrine.  The cases cited by Defendants are more persuasive of how the law of New

3    Jersey should be applied in this case.  AT&T's cases are distinguishable.

4    Defendants argue that the economic loss doctrine bars AT&T from recovering in tort

5    economic losses to which their entitlement only flows from a contract; Defendants cite *Bracco*

6    *Diagnostics Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557 (D.N.J. 2002).  In *Bracco*, a

7    manufacturer of health care products had a "wholesale Distribution Agreement" with Defendant

8    Bergen, pursuant to which there were "chargeback" provisions that Bracco alleged were being used

9    by Bergen in a scheme to cheat it.  Bracco alleged claims for breach of contract in addition to

10   common law fraud and violation of the New Jersey Consumer Fraud Act (NJCFA).  Bergen moved

11   to dismiss the common law fraud and statutory claims.

12   The Court dismissed the NJCFA claim pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state

13   a claim in that Bracco was not a "consumer" of "merchandise" within the meaning of the NJCFA.

14   The court dismissed Bracco's common law fraud claim as well, holding that the economic

15   loss doctrine barred the claim.  The parties in *Bracco* agreed that New Jersey federal and state

16   decisions have held that fraud claims may co-exist with a contract-based cause of action, and the

17   Court acknowledged that the parties' positions presented a close question for the Court.  226 F.

18   Supp. 2d at 563.  The Court noted that "New Jersey federal and state decisions that have permitted a

19   fraud claim to proceed with a breach of contract claim generally appear to have involved a fraud in

20   the inducement of a contract or an analogous situation based on pre-contractual misrepresentations."

21   *Id.*  The *Bracco* Court also cited its most recent statement on the issue where

22   this District Court stated again that the 'critical issue' with regard to economic loss 'is
23   whether the allegedly tortious conduct is extraneous to the contract.'  *Emerson Radio*
      *Corp. v. Orion Sales, Inc.* No. Civ. A. 95-6455, 2000 WL 49361, at *7 (D.N.J.
24   2000), *aff'd in part, rev'd in part on other grounds,* 253 F.3d 159 (3d Cir. 2001).

25   *Id.* at 564.  *Bracco* then cited another case after *Emerson* where the Third Circuit stated:  "New

26   ORDER - 5

Jersey District Courts still hold that fraud claims not extrinsic to underlying contract claims are not maintainable as separate causes of action. *Gleason [v. Norwest Mortgage, Inc.*, 243 F.3d 130, 144 (3d Cir. 2001)]." The *Bracco* court found support for its ruling in the New Jersey Supreme Court's decision in *Alloway v. General Marine Industries, L.P.*, 149 N.J. 620, 695 A.2d 264 (1997). In *Alloway*, the court acknowledged that victims of fraud have rights of recovery under the U.C.C., various state and federal statutes, and common law fraud , but only as to fraud in the inducement. *Alloway* cited N.J.S.A. 12A:1-103 which provided [Court adding emphasis]:

> Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, *fraud* misrepresentation, duress, coercion, mistake, bankruptcy, or *other validating or invalidating cause* shall supplement its provisions.

*Bracco*, 226 F. Supp. 2d at 564. *Bracco* reasoned:

> That citation to section 1-103, which related to "validating or invalidating" causes such as "fraud," supports Bergen's position that only claims for fraud in the inducement are cognizable in conjunction with action that the U.C.C. governs.

Furthermore, *Bracco* noted that the Supreme Court in *Alloway* "expanded the reach of the economic loss doctrine in New Jersey," 226 F. Supp. 2d at 565, referencing the Court's extensive discussion of the policies embodied in contract and tort law and the compelling reasons for limiting recovery for purely economic loss to contractual remedies. *Id. Bracco* concluded that "'it is now well established in New Jersey that contract remedies ... are better suited than tort law to resolve claims for economic loss.' *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp.2d 543, 550 (D.N.J. 1998)." The *Bracco* court stated that it was further moved to dismiss the common law fraud claim because of the economic loss doctrine's underlying main purpose:

> The Third Circuit most recently stated, "The economic loss doctrine is designed to place a check on limitless liability ... and establish clear boundaries between tort and contract law. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002).

226 F. Supp. 2d at 565.

AT&T responds citing several cases that allow fraud claims to proceed under circumstances

ORDER - 6

1    analogous to those herein.  The cases cited, however, are not persuasive because they present

2    circumstances where the plaintiff was, for example, reimbursed on a warranty, there was an

3    independent duty outside of the contract, or the tort occurred at the inception or induced formation

4    of the contract.  As recognized in *Bracco,* the economic loss doctrine bars fraud claims alleged in the

5    performance of a contract, and where fraud claims are allowed, it is generally fraud in the

6    inducement to contract. "New Jersey District Courts still hold that fraud claims not extrinsic to

7    underlying contract claims are not maintainable as separate causes of action."     226 F. Supp. 2d at

8    564, quoting *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 144 (3d Cir. 2001).  Furthermore,

9    the "The pattern that has emerged in New Jersey decisional law is that claims for fraud in the

10   performance of a contract, as opposed to fraud in the inducement of a contract, are not cognizable

11   under New Jersey law." *Bracco*, *id.*

12        First, AT&T cites *Robsac Industries, Inc. v. Chartpak*, 204 N.J. Super. 149, 497 A.2d 1267

13   (App. Div. 1985).   The tort claims in this case were extrinsic to the contract and implicated different

14   duties. In *Robsac,* Plaintiff won a bid to sell to GSA, a federal agency, graphic arts supplies, while

15   Defendant Chartpak came in second. Both Robsac and Chartpak had been successful bidders in the

16   past, and *Robsac* had previously supplied Chartpak products.   In this case, Robsac intended to fulfill

17   the contract with Chartpak products obtained through Artists and Drafting, a dealer/distributor

18   owned by Robsac.  GSA required that Robsac submit evidence of an uninterrupted source of supply,

19   which could be a letter of commitment from the manufacturer.  Robsac obtained such assurance from

20   Chartpak's marketing services manager who orally advised GSA that Artists and Drafting Supplies

21   was an authorized Chartpak dealer/distributor.  Contrary advice was sent in a letter from Defendant

22   John B. Zaepfel, Chartpak's President, who stated that Chartpak could not grant authorization to

23   Artist & Drafting Supplies as a supplier on the contract pending the  investigation by the

24   Commanding General of Travis Air Force Base of contract infractions by Artist and Drafting

25   Supplies.  *Robsac* was subsequently disqualified and Chartpak was awarded the contract.

26   ORDER - 7

1    Robsac filed a seven-count amended complaint alleging (1) malicious interference with

2   contract rights, (2) fraudulent misrepresentation, (3) defamation, (4), (5), (6) Defendant Zaepfel

3   personally committed or directed the corporate torts and was individually liable, and (7) breach of an

4   agreement to take back salable inventory.  The Court held that the first three counts implicating

5   Chartpak should not have been dismissed on summary judgment as there were issues of fact.  The

6   Court held that Counts 4, 5, and 6 were on the same footing and should not have been dismissed,

7   stating: "Corporate officers are liable to persons injured by their own torts, even though they were

8   acting on behalf of the corporation and their intent was to benefit the corporation [citations omitted]

9   and even though they derive no personal benefit."  *Robsac* 497 A.2d at 1271.  The seventh count

10   arose out of the termination of Artists and Drafting as a Chartpak dealer and breach of a contract to

11   take back and pay for salable inventory, and the *Robsac* court held that it should not have been

12   dismissed.

13    AT&T cites *Robsac* for the proposition that a corporate officer will be held liable for any

14   fraud in which he participates, even if his corporation, and not he personally, was the beneficiary of

15   the fraud.  AT&T argues that its case is stronger than that in *Robsac* because only the three

16   individual defendants named in this case – and not the corporation – benefitted from their fraud.

17   While these propositions may be true, the question is whether AT&T can properly bring these claims

18   while at the same time having successfully asserted breach of contract against the corporation, PTC.

19   AT&T was injured by the fraudulent invoices that overstated the amount of actual O&M costs owing

20   as AT&T's pro rata share; the injury consists of the amount of the overcharges.  AT&T claims that

21   Defendants' actions in enriching themselves rendered PTC insolvent, but this is an injury to the

22   corporation, even though, consequently, PTC is unable to pay AT&T's judgment.

23    AT&T also cites *Perth Amboy Iron Works, Inc. v. American Home Assurance Company*, 118

24   N.J. 249, 571 A.2d 294 (1990) which allowed consumer fraud and legal fraud claims to stand.  This

25   case concerned the purchase of a yacht and subsequent discovery of fire damage that had been

26   ORDER - 8

covered up.  Plaintiff alleged violation of the New Jersey Consumer Fraud Act, which the court held encompassed the acts of remote suppliers.  The court concluded that there were potential viable fraud claims, depending on the evidence presented, against all defendants based on the assurances given regarding a series of repairs to make the yacht "like it was brand new, coming right off the line," and "fixed 100%."  543 A.2d at 1029-30.  The Court then discussed the measure of damages for a breach of warranty under the U.C.C. (there was no appeal of the jury's warranty liability determination).  The court concluded that the negligence and strict liability claims were properly dismissed, while the punitive damages claim, while not generally awardable on a warranty theory in the absence of exceptional circumstances, might be available on the fraud count.

*Perth Amboy* concerns duties outside the purchase contract. The repairs also seem to be a continuation of the original fraudulent inducement – continuing to cover up the fire damage to the boat.

AT&T also cites *Alloway*, referenced earlier in *Bracco*  which acknowledged a right of fraud victims to recover pursuant to common-law fraud or other state and federal statutes as well as under the U.C.C.  As stated above, however, the *Alloway* court opined that this was true only as to fraud in the inducement.

*First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693 (D.N.J. 1992), also cited by AT&T, concerns duties owed and breached at the inception of a contract. *First Valley* involved a company (Pagano) that wanted to enter into a financing lease arrangement whereby First Valley would purchase equipment from Goushy then lease it to Pagano.  Goushy submitted an invoice listing twenty-six specifically described items totaling $92,924.  When Pagano stopped making payments under the lease agreement, First Valley discovered that most of the items it had purchased were not owned by Goushy but were already owned by Pagano and encumbered by previously existing security interests.  This is a case of fraud in the inducement.  The U.C.C. governed the sale of goods involved and First Valley was allowed to recover damages on the contract (amount it expended, sales

ORDER - 9

1   tax, less value of eight items recovered plus sales tax, plus incidental and consequential damages.)

2   The *First Valley* court then went on to determine whether First Valley could hold Goushy liable for

3   common-law fraud for violating the New Jersey Consumer Fraud Act.

4          The *First Valley* court noted the controversy over whether a commercial buyer who is

5   economically damaged because of a seller's breach may recover tort damages for purely economic

6   loss, and noted the decision in *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 J.J. 555, 489

7   A.2d 660 (1985), which prohibited a commercial buyer from recovering economic damages under

8   tort theories of strict liability and negligence because the aggrieved plaintiff had a remedy for breach

9   of warranty under the UCC.  *Spring Motors* described the purpose of the tort duty of care to protect

10  society's interest in freedom from harm while a contractual duty arises from society's interest in the

11  performance of promises.  The *First Valley* court concluded that the New Jersey Supreme Court

12  would allow First Valley to pursue its tort damages against Goushy because the facts in this case

13  were unique and constituted a classic case of fraud within the U.C.C. section allowing pursuit of

14  other non-code remedies.  The court opined that First Valley's primary cause of action was a claim

15  for fraud rather than breach of contract because of the unusual nature of the transaction, and the

16  court also took note that punitive damages are available upon successful prosecution of a fraud claim

17  to punish a wrongdoer and to deter future misconduct.  Inducing *First Valley* to enter into the

18  leasing arrangement by purchasing products already owned and encumbered by Pagano tainted the

19  transaction at the outset.

20         Defendants reply to AT&T's arguments that the economic loss doctrine bars precisely the

21  type of claim that AT&T concedes it brings here: fraud in the performance of a contract.  AT&T has

22  not alleged any misrepresentation made by Defendants at the time of contract formation and, thus,

23  cannot claim fraud in the inducement.  Defendants cite *Saltiel v. GSI Consultants, Inc.*, 788 A.2d

24  268, 280 (N.J. 2002) for the proposition that "Under New Jersey law, a tort remedy does not arise

25  from a contractual relationship unless the breaching party owes an independent duty imposed by

26  ORDER - 10

1   law."  In *Saltiel*, the plaintiff landscape architect alleged that the corporation and its officers

2   negligently prepared turfgrass specifications for an athletic field, but the court could not discern any

3   duty owed to the plaintiff that was independent of the duties that arose under the contract.  The

4   court stated: "Under New Jersey law, a tort remedy does not arise from a contractual relationship

5   unless the breaching party owes an independent duty imposed by law."

6        Accordingly, under New Jersey law, the economic loss doctrine bars AT&T's fraud claim for

7   inflated charges in invoices misrepresenting the amount of O&M charges.  *Bracco* is the most recent

8   analogous case.  AT&T's case does not present a case of fraud in the inducement of a contract or an

9   analogous situation based on pre-contractual misrepresentations.  The fraudulent conduct that AT&T

10  alleges occurred in the performance of the contract and was not extraneous to the contract.  AT&T's

11  First Claim for fraud must be dismissed.  The Court need not address Defendants' other asserted

12  bases for dismissal of the fraud claim.

13       **Seventh Claim: RICO**

14       As concluded in the discussion below, AT&T has properly stated a RICO claim, except as to

15  the alleged predicate act of bank fraud.  First, the parties' arguments are set forth followed by this

16  Court's conclusions.

17       Defendants move for dismissal of the RICO claim contending that the lure of treble damages

18  has caused AT&T, as with many other plaintiffs, to cast routine commercial disputes as RICO

19  claims.  *See, e.g., River City Mkts., Inc. v. Fleming Foods West, Inc.*, 960 F.2d 1458, 1465 (9th Cir.

20  1992)("The possibility of treble damages and attorney fees provides a powerful incentive to plead

21  every commercial disappointment in terms of victimization by racketeers.").

22       Defendants argue that AT&T failed to allege RICO predicate acts:  (A) Defendants argue

23  that AT&T has failed to plead a "pattern of racketeering activity," meaning at least two predicate

24  acts.  Specifically, the mail fraud and wire fraud allegations fail to allege that "the defendants formed

25  a scheme or artifice to defraud" and the economic loss doctrine precludes the RICO claims. (B)

26  ORDER - 11

1  Defendants argue that AT&T fails to allege a "scheme or artifice to defraud" a financial institution,

2  which must derive from common law fraud, and AT&T fails to allege "an intent to deceive the <u>bank</u>

3  in order to obtain from it money or property. (C) AT&T fails to allege interstate transportation of

4  stolen property with fraudulent intent, and the "with fraudulent intent" element fails under the

5  economic loss rule.

6        Finally, Defendants argue that AT&T's averments of fraud as RICO predicate acts do not

7  have the particularity required by Rule 9(b).

8        AT&T responds that "State law is irrelevant to determining whether a certain course of

9  conduct is violative of the wire fraud statute." *U.S. v. Louderman*, 576 F.2d 1383, 1387 (9th Cir

10  1978), *cert denied*, 439 U.S. 896 (1978). "The federal mail fraud statute prohibits use of postal

11  services in the furtherance of fraudulent schemes, whether or not prohibited by state law." *U.S. v.*

12  *Foshee*, 606 F.2d 111, 113 (5th Cir. 1979), *cert. denied*, 444 U.S. 1082 (1980). AT&T also argues

13  that there is no "federal Economic Loss Doctrine" that applies here. While the doctrine had been

14  applied in the context of an admiralty products liability claim, that is no basis for concluding that it

15  should be applied to a criminal act of intentional fraud. AT&T argues that the economic loss

16  doctrine hinges upon the nature of the damages asserted from the fraud, but points out that the mail

17  fraud statute does not require any damages at all. All that is required is a scheme to defraud and a

18  knowing use of the mail to execute the scheme. *See, e.g.. U.S. v. Goldberg*, 455 F.2d 479, 480-81

19  (9th Cir. 1972), *cert. denied*, 406 U.S. 967 (1972).

20        On the bank fraud issue, AT&T argues that the plain language of the statute rebuts

21  Defendants argument:

22       Whoever knowingly executes, or attempts to execute, a scheme or artifice –

23       (1) to defraud a financial institution; **or**

24       (2) to obtain any of the moneys, funds, credits, assets, securities, or other property
     owned by, or under the custody or control of, a financial institution, by means of false
25       or fraudulent pretenses, representations, or promises;

26  ORDER - 12

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344 (emphasis added). "It is sufficient if the defendant in the course of committing fraud on *someone* causes a federally insured bank to transfer funds under its possession and control" *U.S. v. Everett*, 270 F.3d 986, 991 (6th Cir. 2001)(emphasis in original). The Ninth Circuit has not taken a position on this issue, but it did not support the Seventh Circuit's decision in *U.S. v. Davis*, 989 F.2d 244 (7th Cir. 1993), which limited the scope of the bank fraud statute to cases in which a bank suffered an actual or potential loss. *See U.S. v. McNeil*, 320 F.3d 1034, 1037-39 (9th Cir. 2003)("the bank was not merely an unwitting instrumentality of a scheme to defraud the IRS, it was also a victim of McNeil's deception.").

As to interstate transportation of stolen property, AT&T argues again that the New Jersey economic loss doctrine should not be imported into a criminal statute. AT&T quotes its Complaint: "Defendants, with knowledge that the payments received from AT&T and others [totalling far in excess of the $3,714,420.00 already found by this Court to have been improperly obtained from AT&T Corp., *see* Complaint ¶ 49] were obtained by fraud, caused the fraudulently obtained monies to be transported in interstate commerce ... ." Complaint ¶ 90.

A.  Mail or Wire Fraud; Economic Loss Doctrine.

AT&T has sufficiently alleged mail and wire fraud, and the economic loss doctrine does not bar the claims.

The economic loss doctrine bars tort claims alleged in the performance of a contract but allows tort remedies where duties are breached that lie outside the duties under the contract. Contract principles are best suited to recovery of benefit-of-the-bargain damages, while tort principles are better suited to resolve claims for personal injuries or damages to other property. *Alloway*, 695 A,2d at 267. Criminal statutes are enacted to protect the public from certain conduct. There is no authority for the proposition that the economic loss doctrine precludes liability for

1   violating statutes preventing criminal activity such as mail fraud and wire fraud or bank fraud when

2   contractual duties have been violated as well.  Thus, while the economic loss doctrine under New

3   Jersey law precludes AT&T's fraud claim as discussed above, the economic loss doctrine cannot

4   preclude liability for violation of a criminal statute in the course of a breach of contract.  Moreover,

5   "state law is irrelevant in determining whether a certain course of conduct if violative of the wire

6   fraud statute." *United States v. Louderman*, 576 /f,2d 1383m 1387 (9th Cir. 1978), *cert. denied*, 439

7   U.S. 896 (1978).  The elements of mail fraud and wire fraud are virtually identical.  *Miller v.*

8   *Yokohama Tire Corp.*, 358 F.3d 616, 620, n. 3 (9th Cir. 2004).

9        Defendants also argue that AT&T has not and cannot allege that Defendants formed a

10   scheme or artifice to defraud, and thus, has not properly alleged mail fraud or wire fraud as RICO

11   predicate acts.  On the contrary, AT&T's Complaint in this matter is detailed as to the Defendants'

12   activities with respect to PTC and their sending invoices to Defendants, and AT&T has sufficiently

13   alleged mail fraud and wire fraud under the applicable statutes.  Also, it is noted that other cases

14   have involved RICO claims predicated upon falsely inflated invoices.  *See, e.g. Sandwich Chef of*

15   *Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 111 F. Supp. 2d 867, 873 (S.D. Tex. 2000)("The

16   Court determines that overbilling during the performance of a contract may be the basis for a civil

17   RICO mail fraud case.").

18        B. Bank Fraud

19        The bank fraud statute quoted above is ambiguous in Section (2) because it does not indicate

20   to whom the fraudulent pretenses, representations, or promises must be directed.  It has been held

21   that a financial institution must have been the intended victim and that conduct that solely defrauds

22   the customer is insufficient, but, it has also been held that it is sufficient if someone causes a federally

23   insured bank to transfer funds under its possession and control.   The Ninth Circuit has not reached

24   the question of whether Section 1344(2) reaches cases in which no deception actually is aimed at the

25   bank to obtain the property, but has opined that although the legislative history of Section 1344

26   ORDER - 14

1  establishes that Congress was concerned to prevent losses to federally-insured institutions, it does

2  not support the proposition that Congress intended to limit the reach of Section 1344(2) to cases in

3  which a bank is put at risk of a loss.  *McNeil*, 320 F.3d at1038 (9th Cir. 2003).  The Ninth Circuit

4  also took note that "portions of the legislative history affirmatively indicate that the statute, as

5  enacted, was intended to be construed broadly to reach a 'wide range of fraudulent activity." *Id.*

6       The discussion in *McNeil* does not persuade this Court to construe AT&T's allegations to

7  constitute bank fraud. To construe the bank fraud statute to reach a "wide range of fraudulent

8  activity" directed at federally-insured institutions, is different from reading the statute to include

9  conduct aimed at someone other than a bank.   To read this statute to include conduct where the

10 fraud is not directed at a federally insured institution is to render more conduct criminal than is

11 otherwise precisely directed by Congress.  This Court would be overstepping its role if it were to

12 enfold into the ambit of bank fraud under 18 U.S.C. § 1344 conduct that is not expressly made

13 criminal by this statute.  Accordingly, Plaintiff's claim of bank fraud as a predicate act fails for failure

14 to allege an intent to deceive a bank in order to obtain from it money or property.

15      C.  Transportation of Stolen Property

16      Again, the economic loss doctrine does not apply in the context of a criminal statute.

17 Moreover, AT&T has sufficiently pleaded interstate transportation of stolen property in Paragraphs

18 49 and 90 of the Complaint.  The payments obtained by fraudulent means were caused to be

19 transported in interstate commerce by causing the carriers' checks in payment of the fraudulent

20 invoices to be sent to the out-of-state banks for collection.  These checks totaled far in excess of the

21 $5,000 amount required by 18 U.S.C. § 2314.

22      D. Particularity

23      "In this circuit, a pleading satisfies the particularity requirement if it identifies 'the

24 circumstances constituting fraud so that the defendant can prepare an adequate answer from the

25 allegations.'" *Deutsch v. Flannery*, 823 F.2d 1361, 165 (9th Cir. 1987).  The section of AT&T's

26 ORDER - 15

1   Complaint entitled "Defendants' Inflated O&M Billling" (Paragraphs 42 – 51) gives sufficient detail

2   for Defendants in this case to understand the allegations and to prepare an adequate answer,

3   describing, as it does, the circumstances, time frame, and means of the alleged fraud.  AT&T has

4   alleged that every quarterly O&M invoice sent by PTC, while PTC was controlled by Defendants,

5   was fraudulent.  (Complaint, ¶ 86.)

6        Thus, AT&T has properly stated a RICO claim, except with respect to its claim of bank fraud

7   as a predicate act.

8        **Fourth Claim: Piercing the Corporate Veil**

9        For the reasons stated in the discussion below, AT&T has properly alleged a claim for

10   piercing the corporate veil to hold Defendants liable for overcharges made pursuant to invoices that

11   misrepresented AT&T's share of actual O&M expenses.

12        Defendants argue that AT&T does not allege that the Defendants failed to honor corporate

13   formalities or that PTC functioned as a mere facade for them, that they were the alter ego of PTC,

14   that they intertwined their personal finances with PTC's, failed to keep requisite records, or

15   otherwise respect corporate formalities.  Defendants argue that AT&T also failed to allege facts

16   showing that Defendants intended to use and did use the corporate form as a means of perpetuating a

17   fraud.  Rather, AT&T uses the same fraud allegation in this claim as with their fraud claim.  Neither,

18   argue Defendants, does AT&T allege that Defendants used the corporate form "deliberately" to

19   render PTC insolvent; rather, AT&T alleges that PTC's insolvency is a consequence of the fraud

20   alleged in the First Claim for relief.  Defendants also argue that the injury to AT&T is a general one

21   that affects all creditors equally.

22        AT&T responds that when the claim is a general one based upon injury to the corporate

23   debtor and all of its creditors, rather than a personal claim belonging to any individual creditor, the

24   bankruptcy trustee has exclusive standing to bring an alter ego claim.  *In re Folks*, 211 B.R. 378

25   (B.A.P. 9th Cir. 1997).  Here, AT&T argues that it is asserting a claim particular to it, "or at least to

26   ORDER - 16

the carriers as a specific group of creditors." (AT&T memo., p. 19.) Thus, AT&T argues that it is entitled to "pierce the corporate veil" to recover from Defendants the overpayments it made to PTC in the amount of the judgment in the prior action and for overpayments made to PTC to the extent not duplicative. AT&T has alleged that : (1) defendants operated PTC as a vehicle for fraud in order to overcharge and obtain funds from AT&T and then siphoned off those funds to themselves through dividends or otherwise; (2) Defendants fraudulently conveyed PTC's assets thereby saddling PTC with enormous debt in order to fund dividend payments, which debt could only be repaid through the continued overcharging of AT&T; and (3) PTC being rendered unable to repay the money fraudulently obtained from AT&T, cascaded into bankruptcy because Defendants had extracted all the value for themselves.

While the corporate form allows a corporation to exist apart from the individuals who comprise it and insulates those individuals from liability for the corporation's conduct, "there are some circumstances under which the corporate entity will be disregarded and liability imposed upon its members." Fletcher, William Meade, Fletcher Cyclopedia of the Law of Private Corporations, § 41, (Perm. Ed.). There are several common factors, among them fraud. *Id.* "Thus, as a general rule, the corporation will be viewed as a legal entity unless it is used to defeat public convenience or perpetrate or protect crime or fraud. Fletcher Cyc. Corp. § 41. A claim for piercing the corporate veil under a theory such as alter ego is not a cause of action in itself; rather it is procedural and serves as a means of imposing liability on an underlying cause of action, such as a tort or breach of contract. *Id.* § 41.10. The alter ego doctrine provides that when the corporation is the mere instrumentality or business conduit of another corporation or person, the corporate form may be disregarded. This doctrine is available to impose liability in causes of action in tort, contract or both, but "under contract law, the disappointed one may not hold the other liable without additional compelling facts." *Id.* at 41.85. This is so because the parties to a contract are presumed to have voluntarily and knowingly entered into the agreement with a corporate party and are expected to

ORDER - 17

1   suffer the consequences of the limited liability of the corporate form. *Id.* "Additional compelling

2   facts" are present with a finding of fraud. *Id.* The mere fact that a relationship is contractual rather

3   than in tort does not end the inquiry as to whether or not there is justification for personal

4   shareholder liability, and the full context of the relationship should be examined. *Id.* "There are two

5   very important considerations: First, what sort of contract is involved; second, is the nature of the

6   activity complained of something of which the plaintiff can be considered to have assumed the risk."

7   *Id.*

8           The parties agree that Delaware law applies, as that is the state of PTC's incorporation.

9   Delaware law permits a court to pierce the corporate veil of a company "where there is fraud or

10  where [it] is in fact a mere instrumentality or alter ego of its owner." *Geyer v. Ingersoll Publ'ns Co.*,

11  621 A.2d 784, 793 (Del. Ch. 1992).

12          AT&T has alleged specific activities by Defendants in its Complaint: (1) that Defendants

13  operated PTC for their personal benefit as a vehicle for fraud in overcharging AT&T, then siphoning

14  off the funds to themselves through dividends or otherwise; (2) that Defendants fraudulently

15  conveyed PTC's assets, saddling PTC with debt to fund dividend payments, which debt could only

16  be repaid through the continued overcharging of AT&T; and (3) that PTC was left unable to repay

17  the money fraudulently obtained from AT&T and found itself in bankruptcy because Defendants had

18  extracted all value for themselves. *See* Complaint ¶¶ 29-38, 65-68, 71-72, 75-78, 82-83, 96-97.

19          Pursuant to *Folks*, which Defendants agree is the controlling decision, AT&T has alleged an

20  injury to itself and not simply a general injury that affects all creditors equally. AT&T was overbilled

21  for its supposed share of actual O&M costs. This is an injury specific to it. AT&T has alleged that

22  Defendants continued with the overbilling in order to pay the debt caused by their making dividend

23  payments to themselves. Under these circumstances, AT&T is not simply a disappointed party to a

24  contract, but has alleged "additional compelling facts" that are sufficient to allow it to pursue liability

25  against the Defendants for the breach of contract judgment entered in the earlier case and any other

26  ORDER - 18

1  overpayments to the extent not duplicative.

2        **Second Claim: Aiding and Abetting Breach of Fiduciary Duty**

3        Defendants argue that the purely contractual relationship between AT&T and PTC did not

4  give rise to a fiduciary relationship; therefore, there can be no claim of aiding and abetting a

5  relationship that did not exist.  Under New York law, which governs the C&MA and IRU, "an

6  arm's-length business relationship does not give rise to a fiduciary obligation." *WIT Holding Corp.*

7  *v. Klein*, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001).  "It is a well-established principle that a

8  simple breach of contract is not to be considered a tort unless a legal duty independent of the

9  contract itself has been violated." *Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 754 N.Y.S.2d

10  320, 322 (N.Y. App. Div. 2003)(Quotation omitted); *accord, Bridgestone/Firestone, Inc. v.*

11  *Recovery Credit Sercvs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).  Here, argue Defendants, AT&T has

12  merely alleged a breach of the C&MA and the IRU contract provisions, and even evidence that

13  AT&T trusted PTC is not sufficient to elevate a good faith contractual relationship to a fiduciary

14  one.  *Bridgestone/Firestone*, 98 F.3d at 20 (placing trust and confidence in party to carry out

15  contract obligations does not create fiduciary relationship).

16        Plaintiffs argue that fiduciary relationships such as attorney/client, doctor/patient,

17  trustee/beneficiary do arise from contracts.  Here, argues AT&T, the C&MA created a relationship

18  in which AT&T and other carriers were compelled to rely upon and trust the three "founding

19  signatories" to look after their best interests, as they had the exclusive right to see the documentation

20  supporting the O&M costs.  This relationship, created by the C&MA by the  founding signatories,

21  the carriers had no control over, but the carriers were, nevertheless obligated to reimburse costs

22  incurred.  Thus, AT&T casts itself as the weaker party overpowered by Defendants so that it could

23  not protect itself.

24        The circumstances in this case do not create a fiduciary duty.  "It is a well-established

25  principle that a simple breach of contract is not to be considered a tort unless a legal duty

26  ORDER - 19

1   independent of the contract itself has been violated.  Similarly, an arms-length transaction does not

2   give rise to a fiduciary duty."  *Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 754 N.Y.S.2d 320,

3   322 (N.Y. App. Div. 2003).  Trusting another to fulfill contract obligations does not create a

4   fiduciary relationship.  *See. e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d

5   13, 20 (2d Cir. 1996).  AT&T's claim for aiding and abetting breach of fiduciary duty must be

6   dismissed.

7   **Stay**

8        The Bankruptcy Trustee requests that the Court stay the following claims: Third, breach of

9   fiduciary duty; Fifth, constructive fraudulent conveyances, Sixth, actual fraudulent conveyances, and

10  Eighth, illegal dividends.  AT&T has no objection to such a stay.  Defendants, however, urge that the

11  Court stay the entire case in order not to have to readdress issues presented in Defendants' motion to

12  dismiss.

13       Only AT&T's First Claim for fraud and Second Claim for aiding and abetting breach of

14  fiduciary duty are being dismissed by this order.  The claims that Defendants sought to be dismissed

15  as "derivative" are, along with the remainder of the case, stayed pending resolution of the

16  Bankruptcy Trustee's intentions.

17  /////

18  /////

19  /////

20  /////

21                                 **CONCLUSION**

22       For the foregoing reasons, Defendants Motion to Dismiss is granted in part, denied in part.

23  Only the claims for fraud and for aiding and abetting breach of fiduciary duty are dismissed.

24  Defendants motion is denied as to piercing the corporate veil and RICO.   This cause of action is

25  stayed pending the Bankruptcy Trustee's determination of whether or not to intervene in this case.

26  ORDER - 20

1     NOW, THEREFORE,

2     IT IS ORDERED:

3     1.    Defendants' Motion to Dismiss [Dkt. # 14] is GRANTED as follows: AT&T's First

4          Claim for fraud and Second Claim for aiding and abetting breach of fiduciary duty, as

5          well as the RICO predicate act of bank fraud in the Seventh Claim are DISMISSED;

6     2.    Defendants' Motion to Dismiss is DENIED as to AT&T's Fourth Claim for "piercing

7          the corporate veil," and as to AT&T's Seventh Claim for RICO, EXCEPT that

8          AT&T's claim of bank fraud as a predicate act is DISMISSED as stated in item # 1.

9     3.    The case is now STAYED pending the Bankruptcy Trustee's determination of

10          whether or not to intervene in this cause of action.  Plaintiff's counsel shall give the

11          Court a STATUS REPORT on the Bankruptcy Trustee's determination by no later

12          than **Friday, November 18, 2005.**

14  DATED this 17th day of October, 2005.

16                                                

17          FRANKLIN D. BURGESS
               UNITED STATES DISTRICT JUDGE

26  ORDER - 21