1   **BUCKNELL STEHLIK SATO & STUBNER, LLP**

2            2003 Western Avenue, Suite 400
              Seattle, Washington 98121
3          (206) 587-0144 • fax (206) 587-0277

4

5                 UNITED STATES DISTRICT COURT

6         WESTERN DISTRICT OF WASHINGTON, AT TACOMA

7

8   AT&T CORP. and ALASCOM, INC., d/b/a        )   NO. C04-5709FDB
     AT&T Alascom, Inc.,                        )
9                                               )
                  Plaintiffs,                   )
10        vs.                                    )
                                                )
11   DAVID W. WALKER, DONALD J.                  )
12   SCHROEDER, and TERRY A. GUNSEL,            )
                                                )
13                Defendants.                    )
                                                )
14   _____   )
     TERRENCE J. DONAHUE, Trustee for the       )
15   Chapter 7 Bankruptcy Estate of PT Cable, Inc., )
                                                )
16            Plaintiff-in-Intervention,         )
                                                )
17        vs.                                    )
                                                )
18   THE CARLYLE GROUP, L.P., a.k.a The Carlyle  )
     Group; NEPTUNE COMMUNICATIONS, LLC; )
19   C/S VENTURE INVESTORS, L.P;.CARLYLE        )
20   U.S. VENTURE PARTNERS, L.P.; CARLYLE       )
     VENTURE PARTNERS, L.P.; CARLYLE           )
21   VENTURE COINVESTMENT, L.L.C.;             )
     NEPTUNE GLOBAL SYSTEMS, LLC (U.S.);       )
22   DAVID W. WALKER and JANE DOE               )
23   WALKER; DONALD J. SCHROEDER and           )
     JANE DOE SCHROEDER; BROOKE B.             )
24   COBURN and JANE DOE COBURN; TERRY         )
     A. GUNSEL and JANE DOE GUNSEL;            )
25   WILLIAM E. CONWAY, JR. and JANE DOE       )

Honorable Franklin D. Burgess

**COMPLAINT IN INTERVENTION**

26

27

28  Complaint in Intervention - 1

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

1 CONWAY; RICHARD G. DARMAN and JANE )
DOE DARMAN; and PETER H. SORENSEN; )
2 NEW YORK LIFE INSURANCE COMPANY, a )
New York mutual insurance company; NEW )
3 YORK LIFE INSURANCE AND ANNUITY )
CORPORATION, a Delaware corporation; )
4 JEFFERSON-PILOT LIFE INSURANCE )
COMPANY, a North Carolina corporation; )
5 JEFFERSON-PILOT FINANCIAL INSURANCE )
COMPANY, a Nebraska corporation; KANE )
6 REECE ASSOCIATES, INC., a New Jersey )
corporation; and JOHN AND JANE DOES 1-100; )
7 )
8                    Defendants-in-Intervention. )
9 _____

10

11                        **I.  IDENTIFICATION OF PARTIES**

12        1.1    Plaintiff.  The plaintiff-in-intervention is Terrence J. Donahue, the duly appointed

13 trustee for the Chapter 7 bankruptcy estate of PT Cable, Inc., fka Pacific Telecom Cable, Inc.

14 (hereafter referred to as "Plaintiff").  The PT Cable, Inc. Chapter 7 proceeding in which the Plaintiff

15 was appointed trustee is pending in the United States Bankruptcy Court for the Western District of

16 Washington in Tacoma, Washington.  This Chapter 7 proceeding initiated as an involuntary petition

17 filed on January 5, 2005.  (PT Cable, Inc. is hereafter "PTC").  PTC is the successor by merger to

18

19 **Neptune Pacific Holdings, Inc.,** a Delaware corporation ("Neptune Pacific"), the former 100%

20 owner of PTC.  In his capacity as trustee for PTC, Plaintiff also has standing to assert causes of

21 action formerly assertable by PTC, Neptune Pacific and/or their creditors.

22        1.2    PTC Affiliated Defendants.  The following named defendants are business entities,

23 associations or enterprises which have or had at relevant times, an ownership interest in, or some

24

25

26                                           **BUCKNELL STEHLIK SATO & STUBNER, LLP**
                                                    2003 Western Avenue, Suite 400
27                                                     Seattle, Washington 98121
Complaint in Intervention - 2                    (206) 587-0144  •  fax (206) 587-0277

28

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

1  manner or degree of control over, PTC.

2      **Neptune Communications, LLC**, is a Delaware limited liability company headquartered in

3  Fairfax, Virginia.  At all times relevant, Neptune Communications, LLC (hereafter, "NCLLC")

4  directly or indirectly owned 100% of Neptune Pacific Holdings, Inc., which, in turn, owned 100% of

5

6  PTC.

7      **Neptune Global Systems, LLC** is a Delaware limited liability company.  Neptune Global

8  Systems, LLC ("NGS") is owned in part by individual defendants, Donald J. Schroeder and David

9  W. Walker, and at all relevant times it owned a member interest in NCLLC.

10

11      **The Carlyle Group, L.P.** is a Delaware limited partnership.  Its partners are a group of

12  affiliated and related business entities controlled by a common group of individuals, either directly

13  or through various entities or agents.  The Carlyle Group, L.P. is headquartered in Washington, D.C.

14   The Carlyle Group, L.P. (hereafter, "The Carlyle Group") has done business throughout the United

15  States and through entities which it owns or controls has transacted business in Washington State as

16
   described herein.  The Carlyle Group, along with the additional related PTC Affiliated Defendants

17  named hereafter and any related John and Jane Does more specifically identified subsequently, are

18
   referred to as the "Carlyle Entities."

19

20      **C/S Venture Investors, L.P.** ("CSVI"), is a Grand Cayman limited partnership and is

21  headquartered in the Grand Cayman Islands.  At all relevant times, CVSI was either a partner,

22  participant in or affiliate of The Carlyle Group and is controlled by persons or other entities within

23  The Carlyle Group, and owned a member interest in NCLLC.

24

25

26                                                        **BUCKNELL STEHLIK SATO & STUBNER, LLP**
                                                              2003 Western Avenue, Suite 400
27                                                             Seattle, Washington 98121
   Complaint in Intervention - 3                              (206) 587-0144  •  fax (206) 587-0277

28

**Carlyle Venture Partners, L.P**. ("CVP") is a Grand Cayman Island limited partnership and is headquartered in the Grand Cayman Islands.  At all relevant times, CVP was either a partner, participant in or affiliate of The Carlyle Group and is controlled by persons or other entities within The Carlyle Group, and owned a member interest in NCLLC.

**Carlyle U.S. Venture Partners, L.P.** ("CUSVP") is a Delaware limited partnership.   At all times relevant, CUSVP was either a partner,  participant in or affiliate of The Carlyle Group and is controlled by persons or other entities within The Carlyle Group, and owned a member interest in NCLLC.

**Carlyle Venture Coinvestment, L.L.C.** ("CVC") is a Delaware limited liability company. At all times relevant, CVC was either a partner, participant in or affiliate of The Carlyle Group and is controlled by persons or other entities within The Carlyle Group, and owned a member interest in NCLLC.

1.3    <u>Individual Defendants</u>.  Individual defendants **Donald J. Schroeder, David W. Walker, Brooke B. Coburn, and Terry A. Gunsel**, were, at all times relevant to the events alleged herein, directors, officers and agents of PTC ("PTC Directors"); **William E. Conway, Jr. Richard G. Darman, Donald J. Schroeder and Peter H. Sorenson**, at all times relevant hereto, were board members, officers and agents of Neptune Pacific Holdings, Inc. ("NPH Directors").  The names of their spouses, if any, are unknown and the correct names thereof will be substituted in for the fictitious names once the true identities are known.  Each of the individual defendants performed every act attributable to them herein on behalf of and for the benefit of their marital community

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

Complaint in Intervention - 4

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

thereby rendering their marital community for any liability arising therefrom.  Donald J. Schroeder and David W. Walker also owned and controlled NGS at all times relevant.  William E. Conway is a founding partner and managing director of The Carlyle Group.  Richard G. Darman is a senior advisor and managing director of The Carlyle Group, also from Washington, D.C.  Brooke Coburn is a managing director of The Carlyle Group, also located in Washington, D.C.

   1.4  <u>Agency and Control</u>.  All of the PTC Affiliated Defendants were, at relevant times, related by some degree of common ownership, common management, common business undertaking or common financial interest, to The Carlyle Group and the individual defendants associated with The Carlyle Group, and/or to NGS and the individual defendants associated with NGS.  Because of this commonality, all of the PTC Affiliated Defendants are charged with the same knowledge of the facts, events and circumstances alleged herein, as charged to The Carlyle Group and the individual defendants associated therewith, and/or NGS and the individual defendants associated therewith, as the case may be.

   1.5  <u>Lender Defendants</u>.  New York Life Insurance Company and New York Life Insurance and Annuity Corporation (hereafter individually and collectively "New York Life") are a New York mutual insurance company and a Delaware corporation respectively, with headquarters in New York, New York.  Jefferson-Pilot Life Insurance Company and Jefferson-Pilot Financial Insurance Company (hereafter individually and collectively "Jefferson-Pilot") are a North Carolina corporation and a Nebraska corporation respectively, with headquarters in North Carolina.  These entities will hereafter be collectively referred to as "Lenders".  The Lenders or their predecessors in

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

interest, on or about June of 1999, purchased $46.7 million worth of Senior Secured Notes issued by Neptune Pacific and PTC.  As part of this note purchase transaction, also referred to herein as "Dividend Loan", all of the assets of PTC, with certain exceptions, were pledged to the Lenders as security for repayment of the Senior Secured Notes.

1.6    <u>Kane Reece</u>.  Kane Reece Associates, Inc. (hereafter "Kane Reece") is a New Jersey corporation that, among other things, renders fairness or valuation opinions in connection with loans and merger transactions.

1.7    **John and Jane Does 1-100** are individuals or business organizations such as associations, proprietorships, partnerships, limited liability companies or corporations, currently unidentified but to be more specifically named when identified, who may have liability to Plaintiff for one or more causes of action stated in this Complaint or related to causes of action stated in this Complaint, whether directly, for aiding and abetting actionable conduct, as transferees of avoidable transfers, or otherwise.  John and Jane Does 1-100 may include, without limitation, additional PTC Affiliated Defendants, additional Individual Defendants, and/or attorneys, accountants, auditors, valuation experts, and other professionals.

## II.  JURISDICTION AND VENUE

2.1    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334 and § 1367, and venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and § 1409.

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

### III.  FACT ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

<u>The North Pacific Cable</u>

3.1      The North Pacific Cable ("NPC") is a trans-Pacific undersea fiber optic telecommuni-cations cable between Japan and Oregon, with a branch or "spur" to Alaska (the "Alaska Spur").

3.2      NPC was constructed by PTC (then known as Pacific Telecom Cable, Inc.), Cable & Wireless PLC ("C&W") (an English company) and International Digital Communications Inc. ("IDC") (a Japanese company) pursuant to a so-called Construction and Maintenance Agreement ("C&MA") dated February 2, 1989.  These three entities (known as the "Founding Signatories") initially owned 100% of NPC's capacity (PTC owning 100% of the U.S. End, including the Alaska Spur, and IDC and C&W owning 100% of the Japanese End), but then sold at a profit portions of their capacity to other telecommunications carriers, including AT&T.  NPC went into service in May 1991.

3.3      C&W and IDC were telecommunications carriers.  C&W originally owned a minority stake in IDC, but subsequently acquired 100% of that company, which was re-named Cable & Wireless IDC, Inc.  C&W and IDC are hereinafter jointly referred to as C&W, without distinction between the individual corporate entities.

3.4      At the time NPC was built, PTC was owned 80% by Pacific Telecom, Inc., an American telecommunications carrier, and 20% by C&W.

3.5      Sales of capacity on NPC occurred in one of two ways.  Until May 1991, when NPC went into service, a carrier could become an Additional Signatory to the C&MA by executing a

Complaint in Intervention - 7

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

Supplemental Agreement. After NPC went into service, a carrier could acquire capacity by entering into an Indefeasible Right of User Interest Agreement ("IRU").

<u>The Obligation to Share Operations and Maintenance Costs</u>

3.6     Once an undersea cable such as NPC has been built, operating and maintaining the cable consists of activities such as monitoring the cable and associated equipment, and paying bills for such items as cableship services, electricity, rent and storage of spare parts. The vast bulk of the costs consist of the fees paid for one or more cableships to stand by in case a repair is needed ("standing costs") and to actually steam out to repair faults in the cable when necessary ("running costs").

3.7     Historically, undersea cables are built by a consortium of carriers who share, on a pro rata basis, the actual costs of operating and maintaining the cable, which costs are passed through to them without any profit mark-up by the carrier or carriers designated as the "Maintenance Author-ity". In marketing telecommunications capacity on NPC, PTC touted its similarities to traditional consortium cables, noting that the Founding Signatories were all carriers or the affiliate of a carrier, and represented that PTC would conform to the historical practice of consortium cables in billing of O&M, namely, to share the actual operations and maintenance ("O&M") costs on a pro rata basis.

3.8     In drafting both the C&MA and the IRUs, PTC used language consistent with the historical practice of passing through actual O&M costs on a pro rata basis. Pursuant to the provisions of the C&MA, the Founding Signatories (i.e., PTC and C&W) constitute the "Mainte-nance Authority" and are jointly responsible for maintaining the undersea portions of NPC. The

Complaint in Intervention - 8

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

C&MA provides that the costs incurred by the Maintenance Authority for maintaining the undersea portion of NPC are to be shared by all owners of NPC capacity in specified percentages. In addition, the C&MA provides that the costs incurred within the United States by PTC in operating and maintaining the U.S. land-based portions of NPC (i.e., the cable landing stations and cable beach joints) are to be shared by the owners of capacity on the U.S. End of NPC in specified percentages. Similarly, purchasers of IRUs for capacity on the U.S. End of NPC are obligated to pay PTC their share of operation and maintenance costs.

   3.9  When NPC went into service in 1991, PTC, as a member of the Maintenance Authority and the provider of NPC's land-based facilities in the United States, periodically billed AT&T and the other owners of capacity on the U.S. End of NPC for what it represented to be their shares of the actual O&M costs incurred. In reality, however, PTC did not simply pass through the actual costs incurred in operating and maintaining NPC, as required by the governing agreements. Without disclosing that it was doing so, PTC included in its O&M invoices a substantial mark-up over the actual costs.

**The Defendants Acquire Control of PTC**

   3.10  The PTC Directors, with the exception of Coburn, each held a senior position with PTC during the period when NPC was being planned and built. In addition, defendants Walker and Gunsel remained in PTC's employ for approximately two years after NPC went into service. After leaving the employ of PTC, all of the defendants except Coburn continued to work in the undersea telecommunications cable industry.

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144 • fax (206) 587-0277

3.11    By virtue of their employment at PTC and their subsequent experience in the undersea telecommunications cable industry, each of the PTC Directors knew or should have been familiar with the industry practice that O&M charges constitute only a pass-through of actual costs. Also by virtue of their employment at PTC, as well as by virtue of subsequent access to the records of PTC, each of the PTC Directors knew or should have known that PTC had represented to prospective purchasers of capacity on NPC that it would conform to industry practice regarding O&M charges.  By virtue of their employment at PTC, as well as by virtue of subsequent access to the records of PTC, each of the PTC Directors was aware, or should have been aware, of the provisions of the C&MA and the IRUs.

3.12    In addition, however, by virtue of their employment by PTC, each of the PTC Directors knew or should have been aware that PTC had in fact been billing O&M charges that exceeded actual costs without disclosing the overcharges to AT&T or other carriers.  They also knew or should have known that, under the terms of the C&MA, only the Founding Signatories had the right to audit the books and records of the Maintenance Authority, and consequently that purchasers of NPC capacity had to rely on the honesty and integrity of the Founding Signatories to bill only the actual costs of O&M.

3.13    When Pacific Telecom, Inc. decided in 1997 to exit the undersea cable business by selling PTC, defendants Walker, Schroeder and Gunsel saw an opportunity to make a financial killing by acquiring PTC for themselves and vastly increasing the amount of clandestine O&M overcharges.

Complaint in Intervention - 10

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

3.14    Not having sufficient resources of their own to purchase PTC, defendants Walker, Schroeder and Gunsel decided to use as a vehicle a joint venture company known as Neptune Communications, LLC ("NCLLC").  28.5% of NCLLC was owned by NGS, a company controlled by defendants Walker, Schroeder and Gunsel, and 71.5% was owned by Carlyle Entities.

3.15    NCLLC, through its wholly-owned subsidiary Neptune Pacific, acquired Pacific Telecom, Inc.'s 80% interest in PTC, as well as C&W's 20% interest, on May 18, 1998.  The acquisition was financed principally through capital contributed by The Carlyle Entities and bank loans.

3.16    Immediately after the closing of the acquisition of PTC, or soon thereafter, defendant Schroeder was appointed Chairman of the Board of PTC and a director of PTC.  Defendant Walker was appointed President and CEO of PTC, and a director of PTC, and defendant Gunsel was appointed Vice President, Treasurer and Assistant Secretary of PTC and a director of PTC.  The Carlyle Entities placed Brooke Coburn on the board of PTC, and William E. Conway, Jr. and Richard G. Darman on the board of Neptune Pacific.

3.17    The bank loans were repaid from funds generated by the sale of the remaining capacity owned by PTC in the U.S. End of NPC.  Upon the repayment of those loans, PTC was debt free.  However, PTC had no further inventory of NPC capacity which it could sell for a profit.  Since it was not entitled to make a profit on O&M, PTC had only two lines of business where it could legitimately make a profit, namely, provision of backhaul and restoration services.  The revenue potential for these lines of business was relatively small, and the defendants had aspirations far in

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

excess of what those lines of business could produce.

## The 1999 Loan and Dividends

3.18    At this point, defendants Walker, Schroeder and Gunsel could have simply sat back and enjoyed the enormous illegitimate profits generated every year by fraudulently inflating O&M invoices.  Instead, they decided to monetize the future revenue stream to be generated by this fraudulent billing, cash out the Carlyle Entities, gain sole control of PTC for themselves, and in the process, extract millions of dollars in cash for themselves.  At the same time, The Carlyle Entities decided to realize the benefit of monetizing the improper future revenue stream, rather than risk its discovery and interruption in the future."

3.19    Pursuant to a Note Purchase Agreement dated June 17, 1999, PTC and Neptune Pacific jointly and severally issued $46.7 million of Senior Secured Notes (the "Notes"), payable in 28 semiannual installments at a fixed interest rate of 7.35%, to a group of insurance company lenders, consisting of New York Life and Jefferson-Pilot (the "Lenders").  The Notes were secured by liens on essentially all of PTC's assets, including its accounts receivable.  (This loan transaction is hereafter "Dividend Loan".)

3.20    PTC, however, received no portion of the proceeds of the Dividend Loan, despite having incurred the liability to repay the debt.  Instead, the entire net proceeds of the Dividend Loan (after deducting transaction costs and a $1.7 million liquidity reserve) went to PTC's parent company, Neptune Pacific.  Neither Neptune Pacific nor PTC used any portion of the Dividend Loan for purposes related to NPC or as working capital of any kind.

Complaint in Intervention - 12

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

3.21    Within days of execution of the note Purchase Agreement, Neptune Pacific declared a dividend of $43 million.  Subsequently, in December 1999, it declared a further dividend in the amount of $1.25 million.  (Collectively, these dividends are hereafter the "Illegal Dividend").  Thus, virtually the entire net proceeds of the $46.7 million Dividend Loan was used to pay dividends to the shareholders of Neptune Pacific.  Ultimately, through subsequent upstreaming, the funds wound up in the pockets of the PTC Affiliated Defendants and/or their ultimate owners, including various Carlyle Entities.  The Illegal Dividend was, effectively if not formally, a dividend by PTC as well as by Neptune Pacific, because PTC borrowed the funds necessary for Neptune Pacific to declare and pay its dividend, provided all or substantially all of the funds to repay the Dividend Loan, and became the successor to Neptune Pacific by merger shortly following the Illegal Dividend transaction.

3.22    The PTC Directors informed the Lenders, and the Lenders understood, that the primary source of revenues from which the Notes would be paid would be PTC's profits from O&M charges to the carriers such as AT&T, notwithstanding that the agreements governing the O&M charges did not permit any profits inasmuch as the O&M charges were required to be solely a pass-through of actual costs incurred.

3.23    One condition of the loan was the Lenders' receipt of a solvency opinion.  Among other things, the Lenders communicated to Kane Reece that the Lenders would specifically require that Kane Reece review the C&MA and IRU's and advise the Lenders that the phrase "operation and maintenance costs" in each such agreement is deemed to include, in the fiber optic cable industry, a

Complaint in Intervention - 13

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

1  return of capital which includes debt service.  The Lenders in fact received such a solvency opinion

2  from Kane Reece dated June 16, 1999.  This opinion concluded that Neptune Pacific and its

3  subsidiaries, including PTC, were solvent and that, after giving effect to the transactions

4  contemplated in the Note Purchase Agreement, including the payment of dividends, those companies

5  (a) had assets with a present fair saleable value that exceeded their pro forma liabilities; (b) would

6  be able to pay their debt obligations and liabilities as such obligations became due in the usual

7  course of business; and (c) would not have an unreasonably small capital base with which to conduct

8  business.  That opinion was incorrect and the PTC Directors knew or with the exercise of reasonable

9  care should have known that its conclusions were false.

10

11

12  3.24    The Kane Reece solvency opinion was based primarily on the assumption that PTC

13  was entitled to make substantial profits on its O&M charges to carriers such as AT&T and, indeed,

14  to charge the carriers amounts sufficiently in excess of the actual O&M costs to enable PTC to repay

15  the principal and interest on the $46.7 million loan.  By assuming that PTC's cash flow from O&M

16  charges included a substantial element of profit for PTC, Kane Reece's discounted cash flow

17  analysis concluded that PTC had an excess of fair saleable value of assets over liabilities (including

18  the $46.7 million debt to the Lenders).

19

20  3.25    The Kane Reece solvency opinion had no basis in fact.  O&M costs are not deemed

21  to include, in the undersea cable industry generally, or in the C&MA and IRUs for NPC in particu-

22  lar, anything more than the actual costs incurred in operating and maintaining the cable.  Upon

23  diligent inquiry, Kane Reece knew or should have known that the C&MA and IRUs did not allow

24

25

26

27  Complaint in Intervention - 14

28

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

1    PTC to charge profits to the carriers, a basic fact undermining both the projections provided by PTC

2    upon which Kane Reece relied, and the ultimate conclusions of Kane Reece.

3            3.26    The PTC Directors and NPH Directors knew or with the exercise of reasonable care

4    should have known that the Kane Reece solvency opinion was ill-founded for at least the following

5

6    reasons:

7            (a)    Kane Reece was not a disinterested expert.  Defendant Schroeder recommended that

8    the Lenders retain Kane Reece to provide the solvency opinion not because it had any expertise in

9    the undersea cable industry, but because its principals had long-standing relationships with

10   Schroeder and because it had previously performed work for PTC.  Kane Reece negligently or

11   intentionally failed to question income projections or assumptions regarding industry practice

12

13   provided by PTC to Kane Reece, wholly or in part due to such prior relationships.

14           (b)    Kane Reece had no expertise in the undersea cable industry, and improperly relied

15   upon the PTC Directors for the basis for its opinion on industry practice.

16

17           (c)    The PTC Directors and NPH Directors knew or should have known that Kane Reece

18   contacted neither carriers who owned capacity on NPC, nor carriers who owned capacity on other

19   undersea cables, to determine what the term "operation and maintenance costs" means in the

20   undersea cable industry.  (Had it done so, it would have found that the term means only the costs

21   actually incurred in operating and maintaining a cable.)

22

23           (d)    The PTC Directors and NPH Directors knew or should have known that neither the

24   IRUs and C&MA relating to NPC, nor the operative agreements for other cables which Kane Reece

25

26                                                                    **BUCKNELL STEHLIK SATO & STUBNER, LLP**
                                                                           2003 Western Avenue, Suite 400
27   Complaint in Intervention - 15                                          Seattle, Washington 98121
                                                                        (206) 587-0144  •  fax (206) 587-0277
28

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

claims to have reviewed, supported an assertion that "operations" and "maintenance costs" means anything other than costs actually incurred in operating and maintaining a cable.

3.27    Because the PTC Directors and NPH Directors knew or should have known that PTC could not justifiably charge carriers such as AT&T anything more than their respective shares of the actual operations and maintenance costs incurred, they knew or should have known that PTC and Neptune Pacific had no legitimate income stream from which they could repay the $46.7 million loan. They thus knew or should have known that PTC and Neptune Pacific would be rendered insolvent when they incurred a debt of $46.7 million without receiving fair – indeed any – consideration. The Dividend Loan and Illegal Dividend were not fair transactions to PTC or Neptune Pacific.

3.28    Each of the PTC Directors and NPH Directors with the possible exception of Peter Sorensen, had an ownership, employment or other substantial financial relationship with entities benefited by the Dividend Loan and Illegal Dividend, and as a result, had conflicts and divided loyalties when serving on the boards of PTC and Neptune Pacific. The boards of PTC and Neptune Pacific were dominated and controlled by the PTC Affiliated Defendants for their own benefit and not that of PTC or Neptune Pacific.

<u>Defendants Walker, Schroeder and Gunsel Gain Sole Control of PTC</u>

3.29    The dividends received by The Carlyle Entities from the proceeds of the $46.7 million loan amounted to over $31 million. Taken together with dividends previously received from the proceeds of PTC's sale of the remainder of its inventory of NPC capacity, The Carlyle Entities

Complaint in Intervention - 16

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

had realized over $40 million on their investment of approximately $5 million in less than two years and had done so by encumbering NPH with $46.7 million in secured debt.  Defendants Walker and Schroeder similarly realized substantial sums based on their investment in NGS, as a result of the dividends.

3.30    Following the depletion of PTC's and Neptune Pacific's capital and assets through the Illegal Dividend, in October of 2000, NGS (then owned solely by defendants Walker, Schroeder and Gunsel) purchased the 71.5% interest of The Carlyle Entities in NCLLC (the sole owner of Neptune Pacific which, in turn, was the sole owner of PTC) for a mere $1.35 million.

3.31    After acquiring sole control of NCLLC, defendants Walker, Schroeder and Gunsel reorganized the ownership structure of NCLLC and its subsidiaries.  NCLLC was merged into NGS. Then Neptune Pacific was merged into PTC.  These steps resulted in NGS becoming the direct parent of PTC.  Finally, NGS distributed its share of PTC to defendants Walker, Schroeder and Gunsel.  As a result of the restructuring, effected in December 2000, defendants Schroeder personally owns 50% of the stock of PTC, and defendants Walker and Gunsel each owns 25%.  In addition, as a result of the merger of Neptune Pacific into PTC, PTC is the sole entity liable for repayment of the $46.7 million loan.

<u>Inflated O&M Billings Continued</u>

3.32    With PTC's inventory of NPC capacity depleted, the profit on backhaul and restoration services paltry, and proper O&M charges restricted to recoupment of actual costs, PTC and Neptune Pacific did not have sufficient sources of legitimate revenue to repay the $46.7 million

Complaint in Intervention - 17

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

1    loan, or from which to continue to pay dividends.

2        3.33    The PTC Directors caused PTC to continue its practice of billing AT&T and the other

3    carriers more than the actual costs of providing O&M – now at a significantly increased level.  Only

4    by doing so was PTC able to keep up its payment to the Lenders, as well as its trade creditors, and

5    even managed to pay the PTC Directors hefty salaries and at least an additional $2 million in

6    dividends.  The PTC Directors managed to accomplish this despite the fact that several carriers went

7    bankrupt and ceased to pay O&M invoices.

8

9        3.34    Since 1998, the PTC Directors have personally determined how much PTC would

10   charge AT&T and the other carriers for O&M.  The PTC Directors intentionally set the level of

11   those charges well in excess of the actual costs incurred by PTC in operating and maintaining NPC,

12   even though they knew that doing so was a violation of the governing contracts and even though

13   they knew that AT&T and the other carriers understood they were being charged only the actual

14   costs of providing O&M.

15

16       3.35    Since 1998 the PTC Directors have caused PTC to render invoices that appeared to

17   bill AT&T and the other carriers only for their share of actual O&M expenses, when in fact the

18   amounts billed far exceeded the actual expenses.

19

20       3.36    The PTC Directors have caused PTC to misrepresent the nature of the O&M charges

21   billed so that the carriers could not readily determine that they were being overcharged for O&M.

22                    The AT&T Litigation and Summary Judgment

23       3.37    In March, 2003, AT&T Corp. commenced an action against PTC in the United States

24

25

26                                        **BUCKNELL STEHLIK SATO & STUBNER, LLP**
                                          2003 Western Avenue, Suite 400
27                                        Seattle, Washington 98121
     Complaint in Intervention - 18      (206) 587-0144  •  fax (206) 587-0277
28

District Court for the District of New Jersey seeking *inter alia*, to recover the overpayments it had made with respect to its IRU circuits by reason of PTC's inflated billings.  PTC subsequently commenced its own action against AT&T Corp. and Sprint Communications Company LP ("Sprint") (which had likewise stopped paying PTC's O&M invoices believing that they were improperly inflated) in the United States District Court for the Western District of Washington.  (Because, unlike the IRUs, the C&MA contained an arbitration clause, the issues of payment and overcharges for circuits acquired under the C&MA are the subject of a pending International Chamber of Commerce arbitration between PTC and numerous other carriers, including AT&T and Sprint.)  AT&T Corp.'s New Jersey action was transferred and consolidated with PTC's Washington action under the caption, *PT Cable, Inc. v. Sprint Communications Company, LP and AT&T Corporation*, No. 03-CV-5202FDB (the "Prior Action").

3.38    By order entered September 22, 2004, AT&T and Sprint were granted Summary Judgment in the Prior Action.  Judge Burgess' order found that the IRUs (and, implicitly, the C&MA) were plain and unambiguous in permitting PTC to bill capacity owners only their respective shares of the actual costs incurred in operating and maintaining NPC.  Judge Burgess concluded that PTC's overbillings predicated on charging O&M profits were unenforceable as a matter of law, constituted a material breach of contract by PTC and excused further performance by AT&T.  The court dismissed PTC's claims against AT&T for breach of contract and awarded AT&T Corp. damages plus interest totaling $5,597,374 with respect to O&M overcharges by PTC in connection with AT&T Corp.'s IRUs.  The court also awarded Sprint a money judgment against

Complaint in Intervention - 19

BUCKNELL STEHLIK SATO & STUBNER, LLP
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

PTC in the amount of $2,482,767.55 plus interest with respect to O&M overcharges to Sprint.

3.39    The PTC Directors herein are officers of PTC and, with the possible exception of defendant Coburn who resigned as a director of PTC in the year 2002, were the individuals responsible for directing and managing PTC's defense of AT&T's claims in the Prior Action. Therefore, the September 22, 2004 order and subsequent judgment in the Prior Action is conclusive and binding upon defendants herein, as a matter of both *res judicata* and collateral estoppel, and the fact of PTC's overcharges is thus established.

3.40    By reason of defendants' intentional concealment of their activities, it was only through discovery in the Prior Action that AT&T learned of the transactions described above, the defendants' role therein, and the manner in which the defendants personally profited from the fraud which they perpetrated through PTC.  Other carriers and creditors of PTC did not learn of these facts at any time prior to the bankruptcy petition against PTC.  PTC, Neptune Pacific and their creditors relied upon the competence and good faith of the PTC Directors and NPH Directors, and such facts were not inherently knowable by PTC, Neptune Pacific or their creditors separate and apart from the knowledge of the wrongdoing defendants herein.

<u>Additional Facts Supporting the Claims Against Lenders</u>

3.41    The Lenders were, at all times, fully apprised of the purpose of the Dividend Loan, and at all times knew that most, if not virtually all of the Dividend Loan proceeds would be used to immediately pay a dividend in favor of the owners of the parent corporation for PTC.

3.42    The Lenders, at all times, knew that PTC would not receive the benefit of any of the

Complaint in Intervention - 20

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

Dividend Loan proceeds and that instead the entire amount of the Dividend Loan proceeds would be used to enrich the ultimate owner of PTC's parent entities.

3.43   The Lenders knew, or with the exercise of reasonable care and diligence should have known, that the Dividend Loan and Illegal Dividend would so encumber PTC that it would, within a relatively short of time, become insolvent and rendered unable to pay its debts as they come due. The Lenders failed to exercise reasonable care and diligence in determining the legitimacy of the basis for the Dividend Loan, accepting blindly the representations of management which were, in turn, accepted blindly by Kane Reece.

3.44   As part of the Dividend Loan transaction, the Lenders purportedly received security interests encumbering virtually all of PTC's assets.  Lenders have, at all times, asserted a security interest in PTC assets and have demanded payment on the Dividend Loan.  For the time it was able, PTC made regular payments to the Lenders for which PTC and Neptune Pacific received no reasonable value in return.  Further, the grant of the security interest by PTC and its assets was given to the Lenders for no reasonable equivalent value.

## IV.  CAUSES OF ACTION

### Cause of Action No. 1 – Illegal Dividend

4.1   The "Illegal Dividend" was not permitted under applicable law.  More specifically, PTC and Neptune Pacific neither had a surplus, as defined in Sections 154 and 244 of Title 8, Delaware Code, nor net profits for the fiscal year in which the dividend was declared together with the preceding year.

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

4.2     All defendants who knew or should have known of the unlawfulness of the Illegal

Dividend are, jointly and severally, liable to the Plaintiff for its full restoration to the PT Cable

estate, including without limitation, the PTC Directors and NPH Directors pursuant to section 174 of

Title 8, Delaware Code.  Further, all defendants who received, either as a conduit or as the ultimate

recipient, any portion of the Illegal Dividend are liable to the Plaintiff for returning any such funds

to the PT Cable estate, together with interest at the federal judgment rate from and after the time of

receipt of the funds until date of entry of judgment.  The individual defendants who knew or should

have known the dividend was illegal but nonetheless approved it or permitted it to take place include

all of the Individual Defendants as well as other potential controlling persons whose identity and

involvement are yet unknown.  The PTC Affiliated Defendants who are liable for the Illegal

Dividend include NCLLC, the Carlyle Entities, and NGS.


<u>Cause of Action No. 2 – Breach of Fiduciary Duty</u>

4.3     The PTC Directors and NPH Directors at all times relevant owed fiduciary duties to

their respective corporate entities.  These fiduciary duties consisted of a separate duty of loyalty, a

duty to act in good faith, and a duty of care.

4.4     By approving, permitting, or failing to take action to prevent the incurring of the

Dividend Loan and the declaration of the Illegal Dividend, and by acting in the sole interest of

themselves or the PTC Affiliated Entities without regard to the interests of PTC, Neptune Pacific

and their creditors, the PTC Directors and NPH Directors breached their fiduciary duties to PTC and

Complaint in Intervention - 22

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

NPH.  By approving, permitting, or not acting to prevent a declaration of the Illegal Dividend, the PTC Directors caused PTC to incur approximately $46.7 million worth of debt while receiving nothing of value in return which rendered PTC insolvent and unable to pay its anticipated debt as they came due, leading to the complete ruination and failure of PTC and NPH as business operations.

4.5    Separately, the PTC Directors and NPH Directors, by approving, permitting or failure to take action to prevent the incurring of the Dividend Loan and declaration of the Illegal Dividend, breached their specific duties of care they owed to PTC and Neptune Pacific because they knew or should, based either on their existing knowledge or upon any reasonable request for and analysis of information to which they did not avail themselves, have known that the projected operations and maintenance revenue which were used to justify the borrowings, which in turn were used to declare the dividend, were legally questionable, unlikely to continue, and presented a very high risk of being sustained into the immediate future.  The directors failed to act with ordinary prudence, and indeed were grossly negligent, in incurring the Dividend Loan and declaring the Illegal Dividend.  Each and every PTC Director and NPH Director failed to exercise due care and due diligence to determine whether and to what extent the projected operation and maintenance revenues could be legitimately charged to users of NPC and knew or should have known that there was a substantial, material risk that a large percentage, if not 100% of the operations and maintenance revenues that were projected, would not be realized.

<u>Cause of Action No. 3 – Fraudulent Transfer</u>

Complaint in Intervention - 23

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

4.6    PTC encumbered its assets in favor of New York Life and Jefferson Pilot for the sole and explicit purpose of acquiring borrowed funds which, at all times, were intended to and did constitute an Illegal Dividend.  Encumbering PTC's assets, borrowing the funds and declaring the dividend were intended to be and were in fact all part of a single transaction.

4.7    The encumbrance of PTC's assets in favor of New York Life and Jefferson Pilot constituted a fraudulent transfer in that the encumbrance was given without receipt of any value, let alone reasonable equivalent value, rendered PTC and NPH insolvent, left them with woefully insufficient capital and rendered them unable to serve not only the debt to New York Life and Jefferson Pilot, but their ongoing operational obligations as well.  Such encumbrance was also made with actual intent to hinder, delay or defraud creditors of PTC including, without limitation, carriers whom PTC had overcharged O&M charges.

4.8    At the time PTC filed for bankruptcy protection, there existed a creditor of PTC who, under Washington State or other applicable law, had standing to bring a fraudulent transfer claim. The Plaintiff, pursuant to 11 U.S.C. § 544, steps in the shoes of that creditor with respect to standing to bring this claim.

4.9    Recipients of the fraudulent transfer, specifically, the granting of liens for all of PTC's assets, are New York Life and Jefferson Pilot.  The grant of a security interest by PTC in its assets to both New York Life and Jefferson Pilot is voidable and should be avoided and preserved for the benefit of PTC's bankruptcy estate.  Further, since the encumbrance was granted, PTC has paid substantial sums in an amount to be established at trial but believed to total in excess of $10

Complaint in Intervention - 24

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

1  million to New York Life and Jefferson Pilot, which, similarly, constitute fraudulent transfers and

2  should be deemed an integrated transaction with the Dividend Loan and Illegal Dividend.  PTC and

3  Neptune Pacific received no value or consideration from any entity, including either New York Life

4  or Jefferson Pilot, in exchange for any payment made to them.  New York Life and Jefferson Pilot,

5  as direct transferees of these payments, are obligated to return all funds received from PTC, plus

6

7  interest at the federal judgment rate from the date and on the amounts received.

8       4.10.   In addition, payment of the Illegal Dividend by NPH was made without receipt of

9  reasonably equivalent value, rendered PTC and NPH insolvent, left them with woefully insufficient

10  capital and rendered them unable to serve not only the debt to New York Life and Jefferson Pilot,

11  but their ongoing operational obligations as well.  The Illegal Dividend was also made with actual

12  intent to hinder, delay or defraud creditors of PTC including, without limitation, carriers whom PTC

13

14  had overcharged O&M charges.  The Illegal Dividend was a fraudulent transfer and should be

15  avoided, as to all transferees of and persons benefited by any portion thereof, with judgment entered

16  against each such transferee for the amount of funds received by that transferee, plus interest at the

17

18  federal judgment rate from the date and on the amounts received.

19            Cause of Action No. 4 − Aiding and Abetting Illegal Dividend

20       4.11    All of the PTC Affiliated Defendants, by and through the participation of their

21  respective officers, directors or shareholders, knowingly participated in and were instrumental in

22  causing, PTC and Neptune Pacific to declare the Illegal Dividend.  Accordingly, they are jointly and

23  severally liable, along with the PTC and NPH Directors for the repayment of this Illegal Dividend to

24

25

26

27  Complaint in Intervention - 25

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

PTC.  Without limiting its right otherwise to amend this Complaint, Plaintiff reserves the right to amend the Complaint to allege liability for aiding and abetting the Illegal Dividend against Kane Reece and/or other John and Jane Does to be specifically identified upon further discovery.

4.12    New York Life and Jefferson Pilot also knowingly participated with the directors of PTC and NPH, and other controlling persons, to effectuate the declaration of the dividend which was made possible only by the participation of New York Life and Jefferson Pilot in the transaction as lenders.  On the face of the transaction alone, New York Life and Jefferson Pilot knew that PTC was fully encumbering its assets well beyond any realistic or reasonable value thereof, receiving nothing of value in exchange therefor, and that the transaction was solely intended and designed to enrich PTC's and Neptune Pacific's owners and controlling persons or entities at the expense of PTC and Neptune Pacific, and to the detriment of their creditors.  Further, New York Life and Jefferson Pilot knew or should have known that the Kane Reece study lacked substance, was the product of manipulation by certain PTC and NPH Directors, and that overall, its conclusions lacked reasonableness and credibility.  New York Life and Jefferson-Pilot admitted in a pleading dated February 25, 2005, filed in the PTC Chapter 7 proceeding while pending in Delaware, that the Dividend Loan rendered PTC insolvent.

4.13    Kane Reece also knowingly participated with the directors of PTC and NPH, and other controlling persons, to effectuate the declaration of the dividend which was made possible only by the participation of Kane Reece in the transaction as a valuation expert providing an acceptable opinion to Lenders.  Kane Reece knew that PTC was fully encumbering its assets well beyond any

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

1    realistic or reasonable value thereof, receiving nothing of value in exchange therefor, and that the

2    transaction was solely intended and designed to enrich PTC's and Neptune Pacific's owners and

3    controlling persons or entities at the expense of PTC and Neptune Pacific, and to the detriment of

4

5    their creditors.  Further, Kane Reece knew or should have known that its opinion lacked substance,

6    was the product of manipulation by certain PTC and NPH Directors, and that overall, its conclusions

7    lacked reasonableness and credibility.

8                    <u>Cause of Action No. 5 – Aiding and Abetting Breach of Fiduciary Duties</u>

9

10           4.14    Each and every PTC Affiliated Defendant and each and every director, officer or

11    controlling person of any such entity defendant, knew or should have known that encumbering

12    PTC's assets as previously alleged, and declaring the Illegal Dividend, violated the PTC and NPH

13    Directors' fiduciary duties to PTC and Neptune Pacific, participated in such transactions in order to

14    obtain the benefit of the Illegal Dividend, and is liable for aiding and abetting the breach of fiduciary

15    duties by PTC and NPH Directors.

16

17           4.15    Similarly, New York Life and Jefferson Pilot knowingly participated in the scheme to

18    encumber PTC's assets in an amount well beyond any reasonable justification and to use those assets

19    and the inflated value thereof to justify borrowings from them which went directly to the benefit of

20    PTC's and Neptune Pacific's owners without any benefit whatsoever to PTC, Neptune Pacific or

21    their creditors, and are liable for aiding and abetting the breach of fiduciary duties by PTC and NPH

22    Directors.

23

24           4.16    Kane Reece also knowingly participated in the scheme to encumber PTC's assets in

25

26

27    Complaint in Intervention - 27

28

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

an amount well beyond any reasonable justification and to use those assets and the inflated value

thereof to justify borrowings from the Lenders which went directly to the benefit of PTC's and

Neptune Pacific's owners without any benefit whatsoever to PTC, Neptune Pacific or their creditors,

and are liable for aiding and abetting the breach of fiduciary duties by PTC and NPH Directors.

Cause of Action No. 6 - Alter Ego

4.17    To the extent any of the PTC Affiliated Defendants have been used as

instrumentalities to perpetrate a fraud or injustice upon PTC, Neptune Pacific and/or their creditors,

the separate existence of such defendants should be disregarded and such defendants should be

found to be alter egos of other liable defendants.

Reservation of Rights against Lenders

4.18    Plaintiff reserves the right to object to the secured claims of Lenders in the Chapter 7

case of PTC, as to validity, priority, amount and scope of any such claims and security interests

securing the same, and/or to seek equitable subordination of such claims, as part of the claims

allowance process in the bankruptcy case.

WHEREFORE, Plaintiff prays for the following relief:

A.    Entry of judgment voiding the transfers alleged in Cause of Action No. 3, preserving

the security interests granted to the Lenders for the benefit of the PTC bankruptcy estate, and

granting monetary damages and, as just and proper in the circumstances, constructive trusts or other

and further equitable relief to recover Divided Loan repayments and proceeds of the Illegal

Dividend or their equivalent, jointly and severally against all respective transferees of and persons

Complaint in Intervention - 28

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277

W:\CLIENTS\2527\103\att case pleadings\complaint in intervention v6 as filed.doc

benefited by any portion of the same;

      B.      Entry of judgment for monetary damages, jointly and severally, against all defendants identified in Causes of Action Nos. 1, 2, 4, and 5 in an amount to be established at trial but equaling or exceeding $46.7 million or, in the case of any defendant(s)s whose liability is exclusively based on receipt of a portion of the Illegal Dividend, in an amount to be established at trial but equaling or exceeding the portion of such Illegal Dividend received by such defendant(s);

      C.      Judgment for all such interest (including pre-judgment interest), costs and attorneys fees as permitted by law;

      D.      Disregard of the separate existence of any PTC Affiliated Defendants used as instrumentalities to perpetrate a fraud or injustice upon PTC, Neptune Pacific and/or their creditors; and

      E.      Such other and further relief as the Court deems just and proper.

      DATED:      April 6, 2006,

                             BUCKNELL STEHLIK SATO & STUBNER, LLP

                             /s/ Edwin K. Sato
                             Bucknell Stehlik Sato & Stubner, LLP
                             2003 Western Avenue, Suite 400
                             Seattle, WA 98121
                             Telephone:  (206) 587-0144
                             Fax:  (206) 587-0277
                             E-mail:  esato@bsss-law.com

_____
                             Thomas N. Bucknell, WSBA # 1587
                             Jerry N. Stehlik, WSBA # 13050
                             Edwin K. Sato, WSBA # 13633
                             Attorneys for Plaintiff

**BUCKNELL STEHLIK SATO & STUBNER, LLP**
2003 Western Avenue, Suite 400
Seattle, Washington 98121
(206) 587-0144  •  fax (206) 587-0277